803 S.E.2d 536

**Brandon FLACK, Petitioner Below, Petitioner**

v.

**David BALLARD, Warden, Mount Olive Correctional Complex, Respondent Below, Respondent**

**No. 15-0901**

Supreme Court of Appeals of West Virginia.

Submitted: February 8, 2017

Filed: June 9, 2017

Sidney H. Bell, Esq., Attorney at Law, Beaver, West Virginia, Counsel for the Petitioner

Patrick Morrisey, Esq., Attorney General, Zachary Aaron Viglianco, Esq., Assistant Attorney General, Charleston, West Virginia, Counsel for the Respondent

WALKER, Justice:

Petitioner Brandon Flack appeals the August 24, 2015 order of the Circuit Court of Mercer County granting, in part, and denying, in part, his petition for habeas corpus. Petitioner alleges that the habeas court erred in (1) denying his claims of ineffective assistance of counsel; (2) denying habeas relief on the basis that the State knowingly introduced false evidence; and (3) denying habeas relief on the basis that the State made inappropriate comments during closing argument. Respondent Warden, Mount Olive Correctional Complex ("the State"), asserts a cross-assignment of error alleging that the habeas court erred in partially granting Petitioner habeas relief on double jeopardy grounds.[1] We have considered the parties' briefs and arguments, the submitted record and pertinent authorities. For the reasons that follow, we affirm, in part, and reverse, in part, the order of the habeas court and remand this matter with instructions as further indicated below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts were established at the trial in this matter and set forth in Petitioner's direct appeal to this Court in *State v. Flack*, 232 W.Va. 708, 753 S.E.2d 761 (2013). Sometime in late January 2011, Petitioner and his accomplices came up with a plan to burglarize the home of Petitioner's uncle, David Flack (the "Flack Residence"). *Id.* at 710, 753 S.E.2d at 763. On the evening of January 28, 2011, Petitioner and his accomplices, who lived in Pulaski, Virginia,

drove to Bluefield, West Virginia, where the Flack Residence was located. *Id.* Arriving shortly after midnight on January 29, 2011, Petitioner and two of his accomplices, Jasman Montgomery and Jacob Thomas, put on the ski masks, obscuring their faces, and approached the back of the Flack Residence and knocked on the door. *Id.* A fourth man, Joseph Flack, remained in the car.[2] *Id.*

Matthew Flack (Petitioner's second cousin), India Simmons (Matthew's cousin), and Milton ("Mel") Thomas (Matthew's friend), were inside the house.[3] *Id.* Hearing the knock on the back door, Matthew looked through a curtain and saw three masked men standing at the back door. *Id.* Matthew then ran upstairs to get a gun. *Id.* As Matthew headed up the stairs, one of the men kicked in the back door.[4] The three men then entered the Flack Residence. *Id.* Following Matthew, Petitioner ran up the stairs and began wrestling with him. *Id.* While Petitioner and Matthew struggled on the landing, Mr. Montgomery ran up the stairs, pulled out a gun and shot Matthew Flack in the face. *Id.* Petitioner was also shot when Matthew Flack fired his gun.[5] *Id.*

Petitioner and his accomplices ran out of the Flack Residence and fled from the scene. *Id.* The men took Petitioner, who was visibly injured, to the hospital. *Id.* at 711, 753 S.E.2d at 764. There, the men told hospital staff that Petitioner had been shot in a drive-by-shooting. Petitioner's injuries were reported to the police by hospital staff and several officers were dispatched to investigate. *Id.* Upon their arrival, one of the officers noticed blood on the inside and outside of the car that Petitioner and his accomplices had driven to the hospital. *Id.* The officers asked for and were given permission to search the car by a young woman named Heather Davis, whose

1. Because Petitioner's claims stem from the underlying trial in this matter, we refer to Respondent simply as "the State." *See Tex S. v. Pszczolkowski*, 236 W.Va. 245 n.2, 778 S.E.2d 694 n.2 (2015).

2. The record before the Court reflects that Joseph Flack was blind.

3. According to the testimony of India Simmons at trial, a minor child, who was asleep on the

couch during these events, was also present in the house.

4. The record before us in this proceeding reflects that at trial, co-defendant Jasman Montgomery testified that when he turned around, he heard either Petitioner or Jacob Thomas kick in the back door.

5. At trial, Petitioner claimed, and the State did not contest, that he was unarmed.

grandfather owned the car. Two handguns and ski masks were found in the trunk.[6] *Id.*

Petitioner was subsequently arrested and charged with one count of first degree murder, one count of burglary, one count of first degree robbery, and one count of conspiracy. *Id.* Pleading not guilty, Petitioner's case proceeded to trial. *Id.* At trial, the State's witnesses included Petitioner's accomplice, Mr. Montgomery, and Dr. James Kaplan, the State Medical Examiner.[7] *Id.*

Mr. Montgomery pled guilty to first degree murder and was sentenced to life with the possibility of parole. *Id.* As part of his plea agreement, Mr. Montgomery testified for the State and told the jury about the plan they had devised, their forced entry into the Flack Residence, his shooting of Matthew Flack, and driving Petitioner to the hospital. *Id.* During the course of the trial, defense counsel did not request any limiting or cautionary instruction regarding the consideration the jurors were permitted to give Mr. Montgomery's guilty plea or his testimony that he murdered Matthew Flack. *Id.*

At trial, Dr. James Kaplan testified that Mr. Flack died as a result of a gunshot wound. *Id.* However, the pathologist who prepared the autopsy report did not testify at trial and defense counsel did not object. *Id.*

On April 26, 2012, following a three-day trial, a jury convicted Petitioner of all charges and recommended mercy for the murder charge. Petitioner then moved for a new trial, asserting that his rights were violated when the trial court failed to sua sponte give the jury a limiting instruction regarding Mr. Montgomery's testimony about his guilty plea. *Id.* Petitioner also argued that because there were no African-American members on his jury panel, his constitutional rights were violated. *Id.* On June 7, 2012, the trial court denied Petitioner's motion for a new trial. *Id.* Because the State had pursued the murder charge based on a felony murder theory, the trial court merged the counts of first degree murder and burglary, resulting in the dismissal of the burglary conviction. Petitioner was sentenced to life with mercy for the first degree murder offense, forty years for the first degree robbery offense and an indeterminate term of one to five years for the conspiracy offense, with all sentences to run consecutively. Petitioner was given 495 days jail credit.

Petitioner filed an appeal of his convictions for first degree murder, first degree robbery and conspiracy alleging that: (1) defense counsel's failure to object to or request a limiting instruction following Mr. Montgomery's testimony on behalf of the State and the relation of his guilty plea to the jury, was plain error requiring a reversal of his convictions under *State v. Caudill*, 170 W.Va. 74, 289 S.E.2d 748 (1982); (2) his right to be tried by a jury drawn from a cross-section of his community was violated; (3) that Mercer County did not comply with the statutory

6. Although there is a dispute in the record before the Court regarding the point at which Ms. Davis and Ms. Burelson joined the men, it is undisputed that Ms. Davis and her friend, Ashley Burelson, were at the hospital with Petitioner's accomplices when officers arrived to investigate.

7. The State also presented several other witnesses at trial: Officers R.S. Gibson and R.D. Davis, who responded to and investigated the crime scene and the car driven by Petitioner and his accomplices on the night of the crime; Lieutenant Scott Myers, the lead investigating officer on the case; Officer John Whitt, who responded to the crime scene and assisted in processing the evidence found at the crime scene and in the car; Mel Thomas (the victim's friend) and India Simmons (the victim's cousin), who were in the Flack Residence at the time of the crime, who testified regarding the men's forced entry into the home, Matthew Flack's struggle with one of the masked men, and the gunshots they heard; Amanda Shorter, a woman who was staying in a house near Flack Residence on the night of the crime, who testified that she witnessed four men get out of a car, change into dark clothing, and enter and exit the Flack Residence; Lt. Roger Reed, section head of the forensic firearm and tool mark section of the West Virginia State Police Forensic Laboratory, who examined the firearms collected from the crime scene and the car; Koren Powers, section supervisor of the trace evidence at the West Virginia State Police Forensic Laboratory who examined all of the evidence submitted from the crime scene for gunshot residue; Mary Heaton, a DNA analyst at the West Virginia State Police Forensic Laboratory who confirmed that Petitioner's DNA was found on one of the ski masks found in the car; and Dr. Byron Smith, the emergency room physician who treated Petitioner for his gunshot wounds.

requirements for assembling a jury pool; and (4) the admission of Dr. Kaplan's testimony concerning the cause of Matthew Flack's death based on findings in an autopsy report prepared by someone other than Dr. Kaplan was plain error. *See Flack*, 232 W.Va. at 712, 753 S.E.2d at 765. Finding no reversible error, we affirmed Petitioner's convictions. *Id.*

On January 7, 2014, Petitioner filed a pro se habeas petition alleging various grounds for relief. The habeas court appointed counsel for Petitioner, who then filed a supplemental petition on his behalf on July 29, 2014. As discussed in detail below, Petitioner contended that despite the fact that the State proceeded under a felony murder theory, defense counsel should have vigorously developed and presented an identity of the shooter defense. Petitioner argues that defense counsel could have asserted that Matthew Flack's death was the result of being accidentally shot by his friend, Mel Thomas, who was positioned above him on the stairwell, and that the fatal shot came from a handgun that was still at the scene when the police arrived and not in the trunk of the car at the hospital. Maintaining that this theory of defense should have been pursued, Petitioner presented the following allegations of error to the habeas court below: (1) the robbery offense was a lesser-included offense to the felony murder offense predicated on burglary and, as such, double jeopardy attached when the two were merged; (2) ineffective assistance of counsel for (a) failure to hire an investigator, an expert in forensic pathology, and a firearms expert and to cross-examine the State's experts; (b) failure to object to the autopsy evidence being elicited from a different pathologist than the one who performed the autopsy; (c) failure to object to the co-defendant testifying in front of the jury in prison attire; (d) failure to request a *Caudill* instruction regarding the co-defendant's testimony; (e) failure to request a copy of the co-defendant's written plea agreement; (f) failure to request a self-defense instruction; and (g) failure to subpoena certain defense witnesses for trial; and (h) failure to object to the medical examiner's testimony as denying him the right of confrontation under

*Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and *State v. Frazier*, 229 W. Va. 724, 735 S.E.2d 727 (2012). The State filed a response to the habeas petition asserting that Petitioner's sentences complied with double jeopardy protections, that Petitioner received effective counsel at trial, and that it was inappropriate to second-guess his counsel's strategy in a petition seeking habeas relief.

The habeas court held an omnibus hearing on July 31, 2015, during which Petitioner testified and called five other witnesses to testify in support of his petition: Officer R.S. Gibson and Lt. C.S. Myers, both with the Bluefield Police Department, Larry Dehus, Danny Lane, and defense counsel Derrick W. Lefler. Officer Gibson, the first officer on the scene of the crime, testified regarding the location of a handgun at the scene, a Hi-Point pistol, and another spent shell casing he observed laying on the second set of stairs on the landing at the crime scene. Lieutenant Myers, the detective on call on the night of the shooting, testified regarding (1) the location of the firearms and casings that were found at the crime scene and submitted to the State Crime Lab; (2) his investigation of the crime and his belief that Mr. Montgomery fired the fatal shot killing Matthew Flack; (3) his interview of Amanda Shorter, the witness who saw four masked men approaching and exiting the Flack Residence; and (4) his interview of Heather Davis and Ashley Burelson, two females who accompanied Petitioner and his co-defendants on the night of the crime, who were picked up and brought to the station for questioning.

Mr. Lefler, Petitioner's defense counsel at trial, testified regarding his initial investigation of the case, the theory of defense presented at trial, and his thought process regarding trial tactics and strategy.[8] Larry Dehus, an expert in forensic science, firearms and ballistics who was retained by Petitioner's habeas counsel, testified that it was improbable that Mr. Montgomery fired the fatal shot killing Matthew Flack based on the trajectory of his wounds and the position of Mr. Montgomery during the crime.

---

8. The substance of Mr. Lefler's testimony is discussed in further detail below.

Danny Lane, a homicide investigator, firearms expert, and former law enforcement officer retained by Petitioner's habeas counsel, testified regarding his personal investigation of the case, what types of opinions a firearms expert would have presented at trial, including a recreation of the crime scene, and his opinion of how the fatal shot killing Matthew Flack occurred. He also testified regarding his interview of Heather Davis, one of the two women accompanying Petitioner on the night of the crime, and his opinion that Ms. Davis's testimony would have been helpful to the defense because it would have discredited Ms. Shorter's testimony. He testified that cell phone extractions from Jacob Thomas's and Heather Davis's cell phones indicated that Ms. Davis and Ms. Burelson did not accompany Petitioner and his co-defendants to the crime scene. He asserted that because the two women were left by Petitioner at a relative's home while they went to buy beer at a convenience store, this evidence would have conflicted with Amanda Shorter's account of events.

On August 24, 2015, the habeas court entered an order granting, in part, and denying, in part, Petitioner's habeas petition and an order correcting Petitioner's sentence pursuant to Rule 35(a) of the West Virginia Rules of Criminal Procedure. The habeas court concluded that Petitioner had failed to prove both prongs of the ineffective assistance of counsel test in *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). The habeas court also rejected Petitioner's assertions that false evidence had been presented by the State at trial, finding that inconsistencies in various witnesses' testimony did not prove falsity but rather, constituted credibility determinations that remained in the province of the jury. However, regarding Petitioner's double jeopardy claim, the court found that Petitioner proved, by a preponderance of the evidence, that he had been improperly sentenced to an additional forty years on the robbery offense because the robbery was also a lesser-included offense to the first degree felony murder charge and he should not have been convicted for the lesser-included offense. The habeas court dismissed the robbery conviction and, pursuant to Rule 35(a) of the West Virginia Rules of Criminal

Procedure, corrected Petitioner's sentence to life with mercy for the first degree felony murder conviction and to an indeterminate term of one to five years for the conspiracy conviction. On appeal, both parties assign error to the habeas court's rulings.

## II. STANDARD OF REVIEW

■ A circuit court's order granting or denying habeas relief is subject to a three-prong standard of review:

"In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009). With these principles in mind, we consider the arguments of the parties.

## III. DISCUSSION

### A. *Ineffective Assistance of Counsel*

Petitioner asserts an ineffective assistance of counsel claim that his court-appointed attorneys, Derrick W. Lefler and Ward Morgan (collectively, "defense counsel"), failed to investigate adequately what he alleges is a serious, complex case. Petitioner bases his claim upon several acts or omissions by defense counsel: (1) failure to interview, subpoena, or otherwise attempt to secure the appearance of Heather Davis and Ashley Burelson; (2) failure to hire an investigator or expert witnesses; (3) failure to cross-examine the State's firearms expert or recognize the discrepancy between the testimony of various witnesses with respect to the firearms used in the shooting and entered into evidence; (4) failure to object to the testimony of the State's medical expert on hearsay and confrontation clause grounds; (5) allowing Petitioner's accomplice, who had previously pled guilty to first degree to appear in prison attire when testifying on behalf of the State;

(6) failure to request a limiting instruction concerning the accomplice's guilty plea, as permitted by *Caudill*, 170 W.Va. 74, 289 S.E.2d 748; and (7) failure to request a jury instruction on self-defense.

▇▇ With respect to the standards that guide our analysis in claims for ineffective assistance of counsel, we have held:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). Noting that "[j]udicial scrutiny of counsel's performance must be highly deferential," we further have held:

> In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

*Id.* at Syl. Pt. 6.

▇▇ "[T]he cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between one another." *Id.* at 16, 459 S.E.2d at 127. Indeed, ineffective assistance claims are rarely granted and only when a claim has substantial merit. *State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 319, 465 S.E.2d 416, 421 (1995). In *Miller*, we explained that:

> [W]e always should presume strongly that counsel's performance was reasonable and adequate. A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden because con-

stitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

194 W.Va. at 16, 459 S.E.2d at 127. "[T]he burden is on the defendant to prove ineffective assistance by a preponderance of the evidence." *State v. Hatfield*, 169 W.Va. 191, 209, 286 S.E.2d 402, 413 (1982).

### *(1) Fact Witnesses*

▇▇ Petitioner contends that defense counsel should have called Heather Davis and Ashley Burelson as fact witnesses at trial. Ms. Davis and Ms. Burelson were with Petitioner and his accomplices during the night of the incident at the Flack Residence. Petitioner argues that their testimony could have been used to undermine the testimony of Amanda Shorter, an eyewitness. Ms. Shorter testified at trial that after 11:00 p.m. on the night of January 29, 2011, she saw four men get out of a car, change into dark clothes and put toboggans on their heads. She testified that the men, who were laughing and being loud, walked up to the back door of the Flack Residence and knocked before the door opened and they entered the house. She further testified that subsequent to the men entering the Flack Residence, she heard gunshots and observed two women, Ms. Davis and Ms. Burelson, run up to the same car and get into the backseat before Petitioner and his co-defendants fled the scene. Petitioner contends that contrary to Ms. Shorter's testimony, the police determined that Ms. Davis and Ms. Burelson stayed behind at an apartment and were nowhere near the crime scene. Petitioner argues that the testimony of the two women could have been used to discredit the testimony of Ms. Shorter, and they would have

testified that there was no discussion of any plan to commit a crime.

Petitioner claims that the private investigator he retained for his habeas corpus case located Ms. Davis, who cooperated with him and gave a recorded interview. He contends that had she been subpoenaed by defense counsel, she would have testified that there was no discussion of a plan to commit a robbery, burglary, larceny or any other crime. He also claims that she would have testified that their car had a full tank of gasoline and they had money to purchase beer, food or anything else that they and Petitioner may have wanted or needed that night. He asserts that this evidence could have discredited several state witnesses and supported Petitioner's version of the events leading up to his entry into the Flack Residence. Petitioner contends that prior to going to the Flack Residence, he left Ms. Davis and Ms. Burelson at a relative's home in order to buy beer at a convenience store and they were waiting on him to return because they were planning to ride home with him in Ms. Davis's grandfather's car.

The State responds that defense counsel's decision not to subpoena these witnesses was a matter of trial strategy and, absent extraordinary circumstances, is outside the purview of an ineffective assistance of counsel claim. The State contends that the theory of the defense presented at trial was that Petitioner and his accomplices did not arrive at the Flack Residence intending to commit any crime and that the conduct of the group as they exited their car and approached the Flack Residence demonstrated their lack of criminal intent, Mr. Lefler stated in his closing argument that there "was no plan [to commit a robbery]" and made reference to Ms. Shorter's testimony recounting her observations of the behavior of Petitioner and the others as they approached the Flack Residence.

At the omnibus hearing, defense counsel Mr. Lefler testified that "we were certainly aware the State intended to proceed on a felony murder theory, and the particulars [of how and by whom Matthew Flack was killed], in all honesty, weren't our focus." Mr. Lefler described Ms. Shorter as "the best witness we had." He reasoned that her testimony was "potentially very beneficial," and that "the last thing they wanted to do" was discredit her. Mr. Lefler testified that Ms. Shorter confirmed that Petitioner and his accomplices made a lot of noise and did not appear to be concerned with being quiet or approaching the house in a fashion that was undetectable. Additionally, because Ms. Shorter testified that she did not see a door kicked in, the defense sought to use her testimony to establish that Petitioner and his accomplices approached the house in a manner that did not appear to be for evil intent. Moreover, Mr. Lefler stated that had Ms. Shorter not been called by the State during its case-in-chief, he would have called her as a defense witness. When Petitioner inquired why Ms. Davis and Ms. Burelson were not subpoenaed to testify, Mr. Lefler explained that although he initially looked for these witnesses when he began investigating the case, he could not locate them.

In *Daniel v. Legursky*, 195 W.Va. 314, 328, 465 S.E.2d 416, 430 (1995), we stated that "[a] decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" (quoting *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir.1995)). We have also noted, "[w]hat defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Miller*, 194 W.Va. at 16, 459 S.E.2d at 127.

■ As we explained in *Miller*, "with [the] luxury of time and the opportunity to focus resources on specific facts of a made record, [habeas counsel] inevitably will identify shortcomings in the performance of prior counsel." *Id.* at 17, 459 S.E.2d at 128. "[P]erfection is not the standard for ineffective assistance of counsel." *Id.* Only if an identified error is "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" is the first prong of the *Strickland* test satisfied. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

As the habeas court correctly determined, defense counsel's decision not to call the two witnesses was a matter of trial strategy. According to the record, defense counsel was aware that these two female witnesses were not present during the shooting. It is clear that defense counsel considered these issues but focused on attacking the burglary charge when the State offered it as the predicate offense for felony-murder and the robbery charge. Mr. Lefler explained that because he believed that Ms. Shorter was Petitioner's best witness and that her testimony would be very beneficial to Petitioner, he did not want to discredit her at trial.

This Court has previously rejected habeas claims predicated upon a failure to interview or call a particular witness. *See e.g., State ex rel. Azeez v. Mangum,* 195 W.Va. 163, 465 S.E.2d 163 (1995); *State v. Spence,* 182 W.Va. 472, 388 S.E.2d 498 (1989); *State v. Jacobs,* 171 W.Va. 300, 298 S.E.2d 836 (1982); *Foster v. Ballard,* No. 14-1023, 2015 WL 6756866 (W.Va. Nov. 4, 2015) (memorandum decision); *Boothe v. Ballard,* No. 13-0740, 2014 WL 2782127 (W.Va. June 19, 2014) (memorandum decision). We have also held that so long as the failure to call a witness is not "due to dereliction on the part of counsel, there is no ineffective assistance." *Legursky,* 195 W.Va. at 329, 465 S.E.2d at 431. For these reasons, we conclude that the decision not to call Ms. Davis or Ms. Burelson for the purpose of discrediting Ms. Shorter's testimony was objectively reasonable and we affirm the habeas court's finding on this issue.

### (2) Expert Witnesses

■ Because Petitioner contends that his case involved a complicated crime scene and forensic evidence, he asserts that defense counsel's decision not to hire an investigator or retain a firearms expert, a forensic pathologist, or a crime scene reenactment expert to discredit the State's theory of the case constituted a constitutionally-inadequate performance at trial. He argues that defense counsel also made no effort to challenge the State's forensic evidence by way of cross-examination, or to object to the state's forensic autopsy evidence that was elicited from the testimony of Dr. Kaplan, who did not perform the autopsy. Petitioner also claims that counsel's failure to object to Dr. Kaplan's testimony allowed hearsay testimony that denied Petitioner's right of confrontation and was reversible error.

■ Petitioner asserts that if defense counsel had retained a crime scene expert prior to trial, he or she would have presented to the jury expert conclusions that the State's theory of the case and the testimony of co-defendant Jasman Montgomery were not accurate and that it is more likely than not that neither Petitioner nor any of his companions caused Matthew Flack's death. Petitioner relies upon on our holding in Syllabus Point 4 of *State ex rel. Davis v. Fox,* 229 W.Va. 662, 735 S.E.2d 259 (2012), that "[w]hen a co-perpetrator is killed by the intended victim of a burglary during the commission of a crime, the surviving co-perpetrator cannot be charged with felony murder pursuant to West Virginia Code § 61-2-1 (2010)." Thus, Petitioner argues defense counsel should have presented a defense that Matthew Flack was accidentally shot by Mel Thomas, who was positioned above him on the stairwell. According to this defense, the fatal shot came from a handgun that was still at the scene when the police arrived and not in the trunk of the car at the hospital. Petitioner asserts that the jury would likely have found reasonable doubt of his guilt and acquitted him if his defense counsel had presented this defense that Matthew Flack was not shot from below by Mr. Montgomery, who clearly could not have fired at Matthew Flack with the Hi-Point pistol that Patrolman Gibson observed at the house near Matthew Flack.

The State responds that defense counsel chose to pursue a trial strategy designed to attack the felony charges of burglary and robbery in order to attack collaterally the felony murder charge. Accordingly, as defense counsel testified at the omnibus hearing, they believed that the jury would not be receptive to a defense case focused on the identity of the shooter. Defense counsel focused on the theory that Petitioner and his co-defendants were not intending to commit a burglary or a robbery, but rather, were simply going to the Flack Residence to visit

with Matthew Flack and the shooting was the product of a tragic, late-night misidentification. According to the State, such a strategy did not require expert testimony or the retention of an investigator.

While counsel's general duty to prepare necessitates an investigation of the facts, there is no constitutional demand that an investigator be hired or for experts to be retained in every case. Given the State's decision to charge Petitioner with felony murder in this case, defense counsel's decision to attack the other felonies, along with the decision not to challenge the State's evidence concerning the identity of the man who shot Matthew Flack, were strategic choices made in furtherance of a clear trial strategy.

■ Addressing the elements of felony murder, we have held:

"[T]he elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) *the death of the victim as a result of injuries received during the course of such commission or attempt.*" *State v. Williams*, 172 W.Va. 295, [310,] 305 S.E.2d 251, 267 (1983).

Syl. Pt. 5, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987) (emphasis added). We recently limited the scope of the felony murder doctrine as it applies to certain circumstances involving the death of a co-perpetrator in *Davis*, 229 W.Va. 662, 735 S.E.2d 259. However, *Davis* has not altered the rule articulated in *Mayle*, which is applicable to the facts in this case.[9]

Accordingly, we conclude that defense counsel's strategy in this case did not require expert testimony to challenge the State's firearms expert or medical examiner, as the identity of the shooter and the specific details of Matthew Flack's death were irrelevant to the felony murder theory of the case presented. So long as Petitioner's criminal act of going to the Flack Residence with the intent to commit burglary and robbery resulted in Matthew Flack's death, the jury could still properly convict Petitioner of felony murder under *Mayle*. Under these circumstances, an alternate shooter theory was inapposite.

Similarly, Mr. Lefler testified that he did not hire a medical examiner because the manner of Matthew Flack's death did not matter. Mr. Lefler reasoned that "had Matthew Flack had a heart attack when he saw a gun and passed … it would have still been felony murder." The same principle applies to the testimony of Dr. Kaplan, to which defense counsel did not object. Dr. Kaplan only confirmed that Matthew Flack died of a gunshot wound, a fact not contested by anyone. As this court explained in Petitioner's direct appeal,

… the error raised by [Petitioner] was harmless beyond a reasonable doubt. Unlike the facts we addressed in [*State v.*] *Frazier*, [ 229 W.Va. 724, 735 S.E.2d 727 (2012) ], where the manner of death was very much in contention, Dr. Kaplan's testimony at [Petitioner's] trial had little probative value and mirrored testimony from other witnesses. Montgomery testified and *admitted to shooting Matthew Flack.* [Petitioner] did not contest Montgomery's testimony that he was the shooter. Dr. Kaplan merely confirmed that Matthew Flack

9. Our holding in *Davis* was consistent with our prior decision in *State ex rel. Painter v. Zakaib*, 186 W.Va. 82, 411 S.E.2d 25 (1991) that a co-perpetrator could not be charged with felony murder when the only death that occurred during the commission of the felony was the suicide of a co-perpetrator. In both cases, we discussed the felony murder doctrine as it existed at common law. We noted in *Davis* that "the statutory offense of felony murder remains deeply ensconced in its common-law foundations," and emphasized that, at common law, "the death in a felony murder case was prototypically that of an innocent individual." *Davis*, 229 W.Va. at 668, 735 S.E.2d at 265.

The State correctly contends that while this Court acknowledged in *Davis* that West Virginia's felony murder statute does not "encompass[ ] every death that occurs in the course of a statutorily-enumerated felony regardless of who causes the death," *Id.* at 668, 735 S.E.2d at 265, nothing in *Davis* suggested that the death of an innocent victim caused by the action of another victim (but linked to the perpetrator through the felonious criminal acts that created the foreseeable risk of harm) would fall outside of the scope of the felony murder doctrine.

died as a result of a gunshot wound, and that the death was a homicide. Of critical import is that nothing in Dr. Kaplan's testimony implicated [Petitioner] in the homicide, linked him to the crimes charged, or made it more likely or less likely that [Petitioner] committed the murder of Matthew Flack.

*Flack*, 232 W.Va. at 716, 753 S.E.2d at 769 (emphasis in original). Likewise, although Petitioner contends that defense counsel missed the discrepancy concerning the location of the Hi-Point pistol that fired the lethal shot, the location of the weapon was not dispositive of any relevant fact in this case. For all these reasons, we affirm the habeas court's finding that defense counsel's tactics were not unreasonable from an objective point of view in a felony murder case.

### (3) *Caudill Instruction*

Petitioner asserts that defense counsel improperly failed to object to co-defendant Mr. Montgomery telling the jury that he had pled guilty to first-degree murder and was serving a life sentence.[10] Petitioner contends that the State was attempting to use Mr. Montgomery's testimony as substantive evidence to prove Petitioner's guilt. Petitioner asserts that defense counsel also failed to ask for a *Caudill* instruction to be given to the jurors that the evidence of the co-defendant's guilty plea and sentence could only be considered on the issue of his credibility and not on the issue of Petitioner's guilt.

▮ In Syllabus Point 3 of *Caudill*, this Court held:

In a criminal trial an accomplice may testify as a witness on behalf of the State to having entered a plea of guilty to the crime charged against a defendant where such testimony is not for the purpose of proving the guilt of the defendant and is relevant to the issue of the witness-accomplice's credibility. The failure by a trial

judge to give a jury instruction so limiting such testimony is, however, reversible error.

Syl. Pt. 3, *Caudill*, 170 W.Va. 74, 289 S.E.2d 748. We explained in *Caudill* that while testimony elicited solely for the purpose of proving guilt is impermissible, "where the testimony regarding the plea is but a small part of an accomplice's testimony" and the accomplice's testimony is otherwise "general and extensive in nature," the prejudice caused by such testimony is limited. *Id.* at 81, 289 S.E.2d at 755. However, we mandated the issuance of a limiting instruction to ensure that a jury did not "misinterpret the purpose for which testimony [concerning a guilty plea] is offered." *Id.*

In Petitioner's direct appeal of his conviction, we recognized that a limiting instruction might only draw attention to an otherwise innocuous mention and that it is better for defense counsel to determine when testimony concerning a plea is of the character that it might be misconstrued by the jury (and thus warrant a limiting instruction). *Flack*, 232 W.Va. at 713, 753 S.E.2d at 766. We therefore modified our prior holding in *Caudill*, concluding that for tactical reasons, a defendant might not want such a limiting instruction and therefore that while the failure to issue the *Caudill* instruction can be reversible error, it is not unless such an instruction is requested by the defense. *Id.*

▮ Turning to the case at hand, it is evident from the record that defense counsel admitted error in failing to seek a *Caudill* instruction. Defense counsel acknowledged in post-conviction proceedings that they were unaware of this Court's holding in *Caudill*. Thus, for purposes of this proceeding, we find that the first prong of *Strickland* has been satisfied and that defense counsel's performance was deficient under an objective standard of reasonableness.[11] *Miller*, 194

---

10. Petitioner also argues that defense counsel failed to object to Mr. Montgomery testifying in jail clothes, but cites no legal authority for the proposition that permitting a witness for the State to testify in "inmate orange" constitutes ineffective assistance of counsel.

11. On appeal, the State now argues that defense counsel's failure was not error because Mr.

Montgomery's testimony was not elicited for purposes of proving Petitioner's guilt, but rather to aid the jury's credibility determination. However, because defense counsel admitted in post-conviction proceedings that they were unaware of this Court's holding in *Caudill*, the habeas court properly determined that defense counsel committed error.

W.Va. 3, 459 S.E.2d 114. However, the habeas court determined that the second prong of *Strickland* (proof that but for counsel's unprofessional errors, the result of the proceedings would have been different) was not satisfied. *Id.* We agree.

As we found in Petitioner's direct appeal, "[t]here was no evidence that the prosecutor sought to infer the defendant's guilt by virtue of Montgomery's guilty plea, nor was there evidence of any aggravating circumstances surrounding Montgomery's testimony." *Flack*, 232 W.Va. at 714, 753 S.E.2d at 767. The State contends, and we conclude, that it did not emphasize the fact that Mr. Montgomery had pled guilty in the presentation of its case. Mr. Montgomery provided wide-ranging testimony concerning his personal knowledge of the incident in question. While the State briefly mentioned Mr. Montgomery's incarceration at the beginning of his direct examination because he was wearing a prison jumpsuit, it is evident from the State's line of questioning that its intent was to assist the jury in making its credibility assessment. The State asked Mr. Montgomery the following question:

> Q. As a part of the plea agreement in the matter whereby you pled guilty to first-degree murder, did you agree to come forward and give truthful testimony, if necessary?
>
> A. Yes.

Following that question, defense counsel asked Mr. Montgomery numerous questions concerning the facts and circumstances of the crime, none of which contained any reference to his plea agreement. The only time the plea agreement was mentioned again was briefly in the prosecutor's closing argument when he noted that "Jasman Montgomery accepted his responsibility and his punishment, life, no guarantee of ever being paroled." Accordingly, it is clear from the record that the State did not elicit testimony about Mr. Montgomery's guilty plea with the intent of relying on that testimony as substantive evidence. Therefore, because Petitioner has failed to demonstrate that defense counsel's decision not to request a limiting instruction was so prejudicial as to change the outcome of the trial, we affirm the habeas court's ruling on this issue.

### (4) Self-Defense Instruction

■ Petitioner alleges that defense counsel was ineffective for not requesting or offering jury instructions on self-defense. Petitioner asserts that the State's evidence was that Mr. Montgomery shot at Matthew Flack only after Matthew Flack shot Petitioner, who was unarmed. Petitioner also contends that without an instruction on "self-defense by defense of another,"[12] the jury was told only that the State's burden of proof was limited to proving that Matthew Flack's death occurred during the commission of a burglary. Petitioner argues that in *State v. Wade*, 200 W.Va. 637, 490 S.E.2d 724 (1997), this Court recognized that in certain circumstances, other jurisdictions have allowed self-defense instructions in felony murder cases in which the facts support such a defense. Accordingly, the evidence of Petitioner being shot first, before Mr. Montgomery fired a shot at Matthew Flack, would have supported a self-defense instruction to the jury. In response, the State contends that Petitioner was not entitled to such an instruction.

In *Wade*, we addressed whether a self-defense instruction was available in response to a charge of felony murder where the predicate felony was delivery of controlled substance. *Id.* at 645, 490 S.E.2d at 732. As a threshold matter, we explained that "any claim of self-defense in response to a charge of felony-murder must be asserted with regard to the predicate felony." *Id.* Acknowledging the traditional applications of self-defense and provocation, we noted that self-defense is typically only available when

> [a] defendant *who is not the aggressor* ... has reasonable grounds to believe, and actually does believe, that he is in imminent danger of death or serious bodily harm from which he could save himself

---

12. There is no such legal concept. Self-defense and defense of another are two separate doctrines. *See State v. Cook*, 204 W.Va. 591, 598, 515 S.E.2d 127, 134 (1999) (discussing both doctrines). While Petitioner sets forth case law regarding the doctrine of self-defense, he does not develop an argument pertaining to the doctrine of defense of another.

only by using deadly force against his assailant has the right to employ deadly force in order to defend himself.

*Id.* (emphasis added) (*quoting State v. W.J.B.*, 166 W.Va. 602, 606, 276 S.E.2d 550, 553 (1981)). Finding no circumstances where the offense of delivery of a controlled substance, standing alone, would yield to a claim of self-defense or provocation, we ultimately concluded that the defendant was not entitled to a self-defense instruction in that case. *Id.*

In the case before us, the evidence presented at trial did not support a request for a self-defense instruction. The jury heard testimony that Petitioner and his accomplices, armed with handguns and donning ski masks, kicked in the back door of and entered the Flack Residence, thus demonstrating that Petitioner was the aggressor. Accordingly, we find no abuse of discretion in the habeas court's denial of habeas relief on this issue.

## B. False Evidence

Petitioner additionally contends that the State presented evidence that it knew, or had reason to believe, was false. Specifically, Petitioner relies upon: (1) various alleged inconsistencies and inaccuracies in the testimony of Ms. Shorter; (2) Mr. Montgomery's failed polygraph test; and (3) the inconsistent testimony of two police officers about where the Hi-Point pistol used to kill Matthew Flack was found. The State contends, and the habeas court found, that all of Petitioner's claims are grounded solely upon inconsistent witness testimony and because credibility determinations remain in the province of the jury, Petitioner has not made the requisite showing of falsity.

In *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009), this Court recognized that "[i]t is a basic principle of law that '[p]rosecutors have a duty to the court not to knowingly encourage or present false testimony.'" *Id.* at 378-79, 701 S.E.2d at 100-01 (quoting *State v. Rivera*, 210 Ariz. 188, 109 P.3d 83, 89 (2005)). "When the State obtains a conviction through the use of evidence that its representatives know to be false, the conviction violates the Due Process Clause of the Fourteenth

Amendment." *Id.* (quoting *State v. Wilkerson*, 363 N.C. 382, 683 S.E.2d 174, 187 (2009)); *see also People v. Diaz*, 297 Ill. App.3d 362, 231 Ill.Dec. 523, 696 N.E.2d 819, 827 (1998) ("The State's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process of law.").

We have previously held that "[a]lthough it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict." Syl. Pt. 2, *In re Investigation of W. Va. State Police Crime Lab., Serology Div.*, 190 W.Va. 321, 438 S.E.2d 501 (1993); *see also United States v. Bagley*, 473 U.S. 667, 678-79, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("'[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' [*United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) ].").

In *Franklin*, we articulated the following test that applies to a claim that the State presented false evidence:

In order to obtain a new trial on a claim that the prosecutor presented false testimony at trial, a defendant must demonstrate that (1) the prosecutor presented false testimony, (2) the prosecutor knew or should have known the testimony was false, and (3) the false testimony had a material effect on the jury verdict.

Syl. Pt. 2, *Franklin*, 226 W.Va 375, 701 S.E.2d 97. Inconsistencies between a witness's trial testimony and their previous statements, or between the testimonies of multiple witnesses, do not necessarily demonstrate falsity. As we stated in *Franklin*, "[i]t [is] the role of the jury to weigh the evidence and make credibility assessments after it observed the witnesses and heard their testimony. The jury made its determination, and this Court will not second guess it simply because we may have assessed the credibility of the witnesses differently." *Id.* at 379, 701 S.E.2d at 101 (quoting *State v. Brown*, 210

W.Va. 14, 27, 552 S.E.2d 390, 403 (2001)); *see also Rivera*, 109 P.3d at 89 ("Absent a showing that the prosecution was aware of any false testimony, the credibility of witnesses is for the jury to determine."); Syl. Pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995) ("Credibility determinations are for a jury and not an appellate court."). Petitioner's claims of false evidence arising from the inconsistent testimony of Ms. Shorter and the proffered testimony of Heather Davis, and the inconsistent testimony concerning the recovery location of the Hi-Point pistol, fail because he has not made the requisite showing of falsity. To the extent that Petitioner's claims rely solely on inconsistent witness testimony, we therefore find Petitioner's arguments unavailing.

 We likewise find Petitioner's argument that Mr. Montgomery failed a polygraph examination equally unconvincing. This court has held that "[p]olygraph test results are not admissible in evidence in a criminal trial in this State." Syl. Pt. 2, *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979). Similarly, the fact that Mr. Montgomery had a potential motive to lie is not enough to satisfy Petitioner's burden. This Court rejected a similar argument in *State v. Brown*, 210 W.Va. 14, 552 S.E.2d 390 (2001). The defendant in *Brown* was convicted by a jury of two murders. One of the issues raised in the appeal involved alleged false testimony by the State's witnesses. The *Brown* opinion set forth the argument as follows:

> [T]he defendant claims that the prosecuting attorney should have known there was a substantial probability that some evidence against the defendant was false, and that this false evidence materially affected the verdict.... The defendant points to the low character and incentive to lie of the State's witnesses, and appears to argue that this should have put the prosecutor on notice that these witnesses were not telling the truth.

*Id.* at 27, 552 S.E.2d at 403. In rejecting the defendant's argument in *Brown*, we stated:

We are not convinced by the defendant's argument. Not only is there no evidence in the record which supports the claim that the prosecutor knew or should have known that evidence was false, there is no proof that any of the State's evidence was actually false. Rather, all that the defendant can demonstrate is that [the] State's witnesses were disreputable persons who had reasons to lie. The witnesses' characters and motives were adduced at trial and argued at length to the jury.

. . . .

It was the role of the jury to weigh the evidence and make credibility assessments after it observed the witnesses and heard their testimony. The jury made its determination, and this Court will not second guess it simply because we may have assessed the credibility of the witnesses differently.

*Id.* at 27, 552 S.E.2d at 403; *see also Rivera*, 109 P.3d at 89 ("Absent a showing that the prosecution was aware of any false testimony, the credibility of witnesses is for the jury to determine."). Petitioner has done no more than argue, like the defendant in *Brown*, that Mr. Montgomery had a motive to lie. Such an assertion is legally insufficient to sustain a claim that the State knowingly presented false testimony. Even if Petitioner was able to prove that the State knew that Mr. Montgomery's testimony was false, Petitioner still fails to prove that any false testimony had a material effect on the jury verdict. Although Mr. Montgomery's testimony was helpful to the State in proving Petitioner's criminal intent, there were numerous other witnesses who testified about the events that occurred on the night of the crime and ample evidence of intent, including ski masks and firearms, presented at trial. Thus, even if the jury found that Mr. Montgomery was not a credible witness, there was still sufficient evidence to convict Petitioner.

 We therefore find no abuse of discretion in the habeas court's rejection of Petitioner's assignment of error based upon alleged false evidence presented by the State.[13]

---

**13.** Additionally, Petitioner contends that even though defense counsel did not object, the State during closing arguments made several impermissible statements vouching for the credibility of Mr. Montgomery that constituted plain error and substantially contributed to a clear miscar-

## C. Double Jeopardy

In its cross-assignment of error, the State asserts that the habeas court erred when it concluded that Petitioner's sentence for his robbery conviction violated double jeopardy. In ruling on this issue, the habeas court stated in its order:

The jury was properly instructed on the felony murder doctrine whereby the jury had to be instructed as to which felony or felonies were the underlying felony offenses to the murder. **The jury was instructed that burglary was the underlying felony offense to the felony murder and the subsequent conviction and penalty therefore was properly merged with the murder offense. The Petitioner has argued that in this case, the burglary offense was dependent upon the robbery offense, which was also instructed to the jury:**

Murder of the First Degree is committed when any person in the commission of or attempt to commit burglary kills another person. Under the felony-murder doctrine, Murder of the First Degree does not require proof of the elements of willfulness, deliberation, premeditation, malice or specific intent to kill. It is deemed sufficient if the homicide occurs during the commission of or the attempt to commit burglary.

Burglary is committed when any person breaks and enters, or enters without breaking either in the daytime or nighttime a dwelling house or outhouse adjoining thereto, or occupied therewith of another person with the intent to commit a crime therein, including, but not limited to *robbery,* larceny, or brandishing.

Before the Defendant can be convicted of Murder of the First Degree under the Felony-Murder Doctrine, the State of West Virginia must overcome the presumption that the Defendant is innocent and prove to the satisfaction of the jury beyond a reasonable doubt that:

1. The Defendant

2. in Mercer County, West Virginia

3. on or about January 29, 2011

4. with the intent to commit the offense of Burglary

5. did enter without breaking in the nighttime

6. the dwelling house

7. belonging to David and Matthew Flack

8. with the intent to commit the crime of armed *robbery* and/or larceny therein

9. and that the Defendant and/or his accomplices in the commission of Burglary

10. did

11. in Mercer County, West Virginia

12. on or about January 29, 2011

13. Cause the death of Matthew F. Flack.

If after impartially considering, weighing and comparing all the evidence, (both that of the State and that of the Defendant) the jury and each member of the jury is convinced beyond a reasonable doubt of the truth of the charge *as to each of these elements of Murder of the First Degree,* you may find the Defendant guilty of Murder of the First Degree as charged in Count One of the indictment. If the jury and each member of the jury have a reasonable doubt of the truth of the charge as to anyone or more of these elements of Murder of the First Degree, you shall find the Defendant not guilty. (emphasis [in original])

**Based upon the jury instructions, *and* the fact that the robbery was the common denominator to the burglary and to the first degree murder offense, this**

---

riage of justice and the denial of his right to a fair trial. Although Petitioner raised this issue as a ground for relief when he filed his *Losh* checklist with the habeas court, this argument was never developed in Petitioner's habeas petition below or discussed during the omnibus hearing. The habeas court summarily found that because

it did not hear any evidence supporting this enumerated ground, this argument was without merit, insofar as the issue had not been proven by a preponderance of the evidence. We affirm the habeas court's finding, as the issue was undeveloped and therefore waived.

Court improperly sentenced the Petitioner to an additional forty years on the robbery offense—the robbery should have been merged with the felony murder as the other underlying predicate felony offense. The instructions provided that in addition to the burglary, the robbery also served as an element to the first degree murder charge, accordingly, the robbery was also a lesser included offense to the murder, and the Petitioner should not have been convicted and punished for that lesser included crime as well.

In the case *sub judice*, there was only one murder victim, therefore the underlying felonies (both burglary and robbery) should have been merged with the felony murder conviction. The Court agrees with the Respondent that on the appeal in this matter, the Supreme Court of Appeals noted the sentence, but made no other comment about it. However, the Court is aware that the issues raised herein, double jeopardy and excessive or severe sentences, were not raised on appeal, therefore, those issues were not before the Supreme Court. Nevertheless, after review of the legal precedent, the Court agrees with the Petitioner: the Petitioner's conviction for robbery should have been dismissed and the sentence therefore should have been subsumed by the greater felony murder offense. Accordingly, the Court FINDS and CONCLUDES that the Petitioner's grounds for double jeopardy, excessive sentence, and severer sentence than expected were proved by a preponderance of the evidence.

(Emphasis added).

The State contends that robbery is not a lesser-included offense of either burglary or felony-murder predicated upon a burglary, as the habeas court concluded. According to the State, the fact that a burglary can be predicated upon a showing that an individual intended to or completed a robbery does not reduce robbery to a lesser-included offense of burglary and does not make robbery the predicate offense to this felony-murder. The State also contends that in Petitioner's case the crimes of robbery and burglary "require

proof of a fact which the other does not." *State v. Pancake*, 170 W.Va. 690, 695, 296 S.E.2d 37, 42 (1982) (quoting *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). The difference in the required elements and proof for robbery and burglary is clear and, in the Petitioner's case, are separate and distinct crimes not precluded by double jeopardy. Accordingly, the State asserts that the jury concluded that Petitioner entered the Flack Residence with the intent to take property or money, that Petitioner knew his co-defendant was armed, and that Petitioner struggled with the victim in the home before the victim was shot, thus convicting him on all charges.

In response, Petitioner alleges that the prosecution chose to present this case under the felony-murder rule to take advantage of the significant benefits to the State of not having to prove premeditation, deliberation, malice or even a specific intent to kill. Petitioner claims that in exchange for those substantial advantages and reduced burden of proof, the State should not be able to then seek additional sentences for the underlying enumerated offenses. He asserts that because the State had to prove an intent to commit robbery as an element of proving burglary, this made it impossible for the court to determine which offense was the basis of the felony-murder verdict.

"The double jeopardy clauses of our federal and state constitutions protect an accused in a criminal proceeding from multiple prosecutions and multiple punishments for the same offense." *Williams*, 172 W.Va. at 310, 305 S.E.2d at 266. However, double jeopardy does not preclude a State from imposing separate punishments for each separate and distinct crime that arises from a single factual occurrence. *See e.g., Pancake*, 170 W.Va. at 694-97, 296 S.E.2d at 41-44 (upholding defendant's convictions for both burglary and rape arising from the same criminal transaction); *see also State ex rel. Johnson v. Hamilton*, 164 W.Va. 682, 266 S.E.2d 125 (1980).

In the absence of any expression of legislative intent on the issue, the test of whether violations of separate statutory provisions arising out of one criminal episode

constitute the "same offense" for double jeopardy purposes is the "same evidence" test. *Williams*, 172 W.Va. at 311, 305 S.E.2d at 267. We have held that "[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Pancake*, 170 W.Va. at 695, 296 S.E.2d at 42 (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

▮ In Syllabus Point 8 of *Williams*, we held that "[d]ouble jeopardy prohibits an accused charged with felony-murder, as defined by W.Va. Code § 61-2-1 (1977 Replacement Vol.) from being separately tried or punished for both murder and the underlying enumerated felony." Syl. Pt. 8, *Williams*, 172 W.Va. 295, 305 S.E.2d 251. As we explained in *Williams*:

> [A]pply[ing] the same evidence test ... we think it is clear that the [underlying felony] upon which a felony-murder case is based constitutes a lesser included offense. The commission of the [underlying felony] was an essential element of the crime of felony-murder as proved by the State. The statute[ ] which define[s] [the underlying felony] do[es] not require proof of any fact which the felony-murder provision did not. Consequently ... we hold that double jeopardy prohibits an accused charged with felony-murder ... from being separately tried or punished for both murder and the underlying enumerated felony.

*Id.* at 311, 305 S.E.2d at 267-68. We concluded in *Williams* that because the jury was instructed that it might return a guilty verdict on the felony murder charge upon a finding that the appellant participated in the commission of either the robbery or the arson, it was impossible for us to determine which of the two charges the jury found to be the underlying felony. *Id.* at 312, 305 S.E.2d at 268. Accordingly, to ensure that double jeopardy principles were not violated, we reversed the sentences for both the arson and robbery convictions and remanded the case for resentencing. *Id.*; *see also State v. Tes-*

*ack*, 181 W.Va. 422, 383 S.E.2d 54 (1989) (remanding case in order to determine which sentence should be merged, since it was not clear to Court which felonies (burglary, attempted robbery, or assault) served as basis of defendant's felony murder conviction).

▮ In this case, Petitioner was convicted of the charges of conspiracy, robbery, burglary, and felony murder. It is evident from the record that the underlying felony upon which the felony murder charge was predicated was burglary. Therefore, the habeas court's merger of those two offenses was proper under *Williams*. However, the habeas court's conclusion that Petitioner's robbery conviction violated double jeopardy was erroneous because robbery is not a lesser included offense of burglary or a felony murder predicated upon burglary. Each provision requires proof of a fact which the other does not.

West Virginia Code § 61-2-12(a) (2014) provides, in pertinent part, as follows:

> Any person who commits or attempts to commit robbery by: (1) Committing violence to the person, including, but not limited to, partial strangulation or suffocation or by striking or beating; or (2) uses the threat of deadly force by the presenting of a firearm or other deadly weapon, is guilty of robbery in the first degree and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than ten years.

In *State v. Harless*, 168 W.Va. 707, 709-10, 285 S.E.2d 461, 463-64 (1981) we previously explained that

> [a]t common law, the definition of robbery was (1) the unlawful taking and carrying away, (2) of money or goods, (3) from the person of another or in his presence, (4) by force or putting him in fear, (5) with intent to steal the money or goods. (Internal citations omitted). Thus, at common law, robbery could be accomplished either by actual physical force or violence inflicted on the victim or by intimidating the victim by placing him in fear of bodily injury. (Internal citations omitted) ... There were no degrees or grades of common law robbery.

W.Va. Code, 61-2-12, enacted in 1931, divides robbery into two separate classes and calls for different penalties: (1) robbery by violence or by the use of a dangerous weapon, and (2) all other robberies. By dividing robbery into these two categories, our legislature joined a number of other legislatures in recognizing a greater culpability and more severe punishment for a robbery committed by violent means than for a robbery committed by nonviolent means. (Internal citation omitted).

(footnotes omitted). In discussing the essential elements to prove robbery in light of the amendments to West Virginia Code § 61-2-12, we stated in *Harless*:

[w]e previously noted that under the common law definition robbery could be committed by two general means. The first was by force and violence to the person, in which event there is no necessity to prove that the victim was placed in fear of bodily injury, since the actual force on the victim can be presumed to have engendered fear. (Internal citations omitted).

The second common law means of committing robbery was through intimidation, that is, by placing the victim in fear, usually of bodily injury. It is this second category under the common law definition which encompasses our nonaggravated [second degree] form of statutory robbery. Therefore, the distinguishing feature of a nonaggravated [second degree] robbery is that it is accomplished, not through violence to the victim or the threat or presentation of firearms or other deadly weapon or instrumentality, but through intimidation that induces fear of bodily injury in the victim. In the case of an aggravated [first degree] robbery, fear of bodily injury is not an essential element of the crime, since the actual physical force or violence or threat or presentation of firearms or other deadly weapon or instrumentality can be presumed to have created fear of bodily injury.

168 W.Va. at 712, 285 S.E.2d at 465 (footnotes omitted). Thus, we noted:

[a]n appropriate charging portion of an instruction for "aggravated" robbery would be:

"Aggravated robbery is defined as the unlawful taking and carrying away of money or goods from the person of another, or in his presence, by the use of force or violence on the victim or through the use of a dangerous or deadly weapon or instrumentality, and with the intent to steal such property."

*Id.* at 712 n.8, 285 S.E.2d at 465 n.8. This Court further clarified in *State v. Gibbs*, 238 W.Va. 646, 797 S.E.2d 623 (2017) that:

[A] plain reading of subsections (a) and (b) of W.Va. Code, § 61-2-12 shows that the Legislature has more or less codified the common law definition of robbery and graded the degrees of robbery according to the level of violence involved, with First Degree encompassing the more dangerous and violent forms of robbery (the common law equivalent of "robbery by force") and Second Degree encompassing the less dangerous forms of robbery (the common law equivalent of "robbery by fear").

. . . .

[Thus,] First Degree Robbery require[s] that the State prove beyond a reasonable doubt that the offense alleged was committed with "violence to the person" or that the offense was committed with a "threat of deadly force by the presenting of a firearm or other deadly weapon." W.Va. Code, § 61-2-12 (a)[.]

*State v. Gibbs*, 238 W. Va. at 658, 797 S.E.2d at 635 (quoting *State v. Hatley*, 223 W.Va. 747, 753-54, 679 S.E.2d 579, 585-86 (2009) (Ketchum, J., concurring)). Accordingly, in this case, to prove the count of robbery, the State was required to prove the following elements: (1) the unlawful taking and carrying away, or the unlawful attempt to take and carry away, (2) money or goods, (3) from the person of another or in his presence, (4) by violence or threat of deadly force by the presenting of a firearm or other deadly weapon, (5) with intent to steal the money or goods. *Harless*, 168 W.Va. at 709, 285 S.E.2d at 463.

In contrast, West Virginia Code § 61-3-11(a) (2014) provides:

(a) Burglary shall be a felony and any person convicted thereof shall be con-

fined in the penitentiary not less than one nor more than fifteen years. If any person shall, in the nighttime, break and enter, or enter without breaking, or shall, in the daytime, break and enter, the dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of burglary.

Thus, in order to obtain a conviction for burglary under West Virginia Code § 61-3-11(a), the State was required to prove the following elements beyond a reasonable doubt: (1) entrance, with or without a breaking at night, but requiring a breaking during the day, (2) into a dwelling house or adjoining outhouse, (3) of another, (4) with intent to commit a crime therein. W. Va. Code § 61-3-11(a); *see also State v. Louk*, 169 W.Va. 24, 25, 285 S.E.2d 432, 434 (1981).

When we compare the required elements for robbery and burglary, it is evident that each provision requires proof of a fact that the other does not. In order to obtain a conviction for each separate offense, the State was required to put on evidence demonstrating Petitioner entered the Flack Residence intending not only to steal (burglary), but also to steal by committing violence to Matthew Flack (robbery). Here, the jury concluded that Petitioner was either aware that Mr. Montgomery had a weapon, or he used force when he put his hands on Matthew Flack and they struggled in the stairwell.

 The same logic applies when we compare the elements of robbery and felony murder predicated on burglary. As to felony murder:

"'[T]he elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt.' *State v. Williams*, 172 W.Va. 295, [310,] 305 S.E.2d 251, 267 (1983)."

Syl. Pt. 5, *Mayle*, 178 W.Va. 26, 357 S.E.2d 219. As the State correctly contends, the elements of a felony murder predicated on burglary are the elements of burglary, plus the death of a victim. Accordingly, in proving the elements of felony murder predicated on burglary, the State was required to prove a fact that it was not required to prove in establishing the elements of robbery, and thus, robbery is not a lesser included offense of felony murder predicated on burglary. Therefore, double jeopardy does not prohibit the imposition of a punishment for both crimes.

Accordingly, we conclude that double jeopardy did not preclude the imposition of a separate sentence punishing Petitioner for the robbery conviction in this case, and the habeas court erred when it granted Petitioner relief habeas relief from the robbery sentence.

## IV. CONCLUSION

For the foregoing reasons, we conclude that Petitioner has not demonstrated that he is entitled to habeas relief. Moreover, the habeas court's dismissal of Petitioner's robbery conviction was erroneous. Accordingly, we affirm, in part, and reverse, in part, the August 24, 2015 order of the Circuit Court of Mercer County, and we remand this matter with instructions to reinstate Petitioner's conviction and sentence for robbery on the terms previously imposed.

Affirmed, in part, Reversed, in part, and Remanded with Instructions.

JUSTICE KETCHUM concurs, in part, and dissents in part, and reserves the right to file a separate opinion.

JUSTICE KETCHUM, concurring, in part, and dissenting, in part.

While I generally agree that the petitioner is not entitled to habeas relief, I take exception on one issue. I disagree with the majority's conclusion that double jeopardy did not prevent the petitioner from being tried and punished for both felony-murder and robbery. I would uphold the ruling of the habeas court which dismissed the robbery conviction,

thereby correcting a double jeopardy violation which occurred at the trial court level.

Both burglary and robbery are included in the list of predicate offenses pertaining to felony-murder in *W.Va. Code*, 61–2–1 [1991]. Here, as the trial court's instructions demonstrate, both burglary and robbery were placed before the jury in the context of felony-murder. Although the trial court later dismissed the burglary conviction as having merged with the felony-murder conviction, the petitioner was nevertheless convicted of robbery. The result was an additional penitentiary sentence of forty years for robbery to be served consecutively with the murder and conspiracy convictions. The robbery charge was, thus, treated by the trial court as both an element of felony-murder and as a separate offense, resulting in the additional sentence.

Even though the jury was instructed that robbery, under the circumstances, could be considered in conjunction with burglary, it is impossible to tell from the trial record the respective weight the jury assigned to the burglary and robbery charges. If the jury based its felony-murder conviction on robbery, double jeopardy would prohibit the petitioner from being convicted and sentenced for both felony-murder and robbery. It can reasonably be inferred that the jury gave significant consideration to the robbery charge inasmuch as the petitioner was found guilty of robbery in the first degree.

Syllabus point 8 of *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983), holds: "Double jeopardy prohibits an accused charged with felony-murder, as defined by W.Va. Code § 61–2–1 (1977 Replacement Vol.), from being separately tried or punished for both murder and the underlying enumerated felony." Based upon *Williams*, I agree with the conclusion of the habeas court that the trial court "improperly sentenced the Petitioner to an additional forty years on the robbery offense—the robbery should have been merged with the felony murder as the other underlying predicate felony offense."

Therefore, for the reasons stated, I concur, in part, and dissent, in part.