# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.) No. 18-0624** (Berkeley County CC-02-2017-F-183)

**Kevin C. Hamill,**
**Defendant Below, Petitioner**

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.) No. 18-0628** (Berkeley County CC-02-2017-F-184)

**Courtney Hamill,**
**Defendant Below, Petitioner**

**FILED**

**January 17, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Kevin C. Hamill (hereinafter "Mr. Hamill"), by counsel S. Andrew Arnold and J. Daniel Kirkland, appeals the Circuit Court of Berkeley County's June 11, 2018, order sentencing him to life in prison without mercy following his convictions of felony murder, burglary, grand larceny, conspiracy to commit robbery, and being a prohibited person in possession of a firearm.[1] Petitioner Courtney Hamill (hereinafter "Ms. Hamill"), by counsel B. Craig Manford, appeals the Circuit Court of Berkeley County's June 11, 2018, order sentencing her to life in prison with mercy following her convictions of felony murder, burglary, and conspiracy to commit robbery.[2] The State of West Virginia, by counsel Elizabeth Grant, filed a response in support of the circuit court's orders. On appeal, Mr. Hamill argues that the circuit court erred in denying his motions for judgment of acquittal and denying his motion to sever the charge of him being a prohibited person in possession of a firearm from the remaining counts

---

[1]As set forth more fully below, Mr. Hamill was also sentenced to other terms of incarceration which were ordered to run consecutively to his life sentence.

[2]As set forth more fully below, Ms. Hamill was also sentenced to other terms of incarceration which were ordered to run concurrently to her life sentence.

1

charged. Ms. Hamill argues that the circuit court erred in denying her motions for judgment of acquittal, its response to a jury question, and permitting testimony regarding unauthenticated bullets.[3]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

### Factual and Procedural Background

On January 12, 2017, Patrolman First Class Brian Rouse of the Martinsburg Police Department responded to an anonymous caller who requested a welfare check. Upon arriving at the disclosed address, Patrolman Rouse found the door to be ajar. Entering the building, Patrolman Rouse found the dead body of Ramon Walker ("the victim") lying on the living room floor. The victim appeared to have been shot once in the head. The apartment had been ransacked, and a neighbor reported that the victim's car was missing. After learning this information, Patrolman Rouse entered the victim's vehicle information into a nationwide system, alerting law enforcement to be on the lookout for the victim's car. Captain Kevin Miller of the Martinsburg Police Department also responded to the scene. During a search of the house, Captain Miller located a receipt for a Smith and Wesson nine millimeter handgun that had been purchased by the victim approximately a week earlier. However, the handgun was missing from the apartment, along with the victim's wallet and cellphone.

At approximately 6:00 the next morning, the Martinsburg Police Department received a phone call from law enforcement officers in Clarke County, Virginia, reporting that the victim's car was discovered on fire in a remote location. Captain Miller arranged for the vehicle to be towed back to West Virginia and stored until it could be further processed. While still in Virginia, Captain Miller received a phone call alerting him that an informant had come forward regarding the homicide. The informant reported that her best friend, Destiny Baker, confessed that she and petitioners, Mr. Hamill and Ms. Hamill, went to the victim's house with the intent of robbing him.[4] Ms. Baker told the informant that, while there, Mr. Hamill shot and killed the victim, who was romantically involved with Ms. Hamill. The informant agreed to wear a recording device and speak with Ms. Baker later that evening. During their conversation, Ms. Baker again confessed to going to the victim's home with a plan to rob him. Ms. Baker stated that she was in the bathroom when she heard Ms. Hamill cough to signal to Mr. Hamill to enter

---

[3]On December 3, 2018, this Court granted the State's motion to consolidate cases 18-0624 and 18-0628 and ordered that the cases would be consolidated for the purposes of briefing, consideration, and decision.

[4]Petitioners are half-siblings.

2

the living room, and then heard a gunshot. Ms. Baker also told the informant that money was taken from the victim.

Based upon the recorded conversation, officers proceeded to Ms. Hamill's residence, where they obtained statements from both Ms. Hamill and Ms. Baker.[5] Officers then obtained arrest warrants for petitioners and Ms. Baker, along with a search warrant for Ms. Hamill's residence. After her arrest, Ms. Baker provided a recorded confession of the events leading up to the homicide. Ms. Baker reported that, on the evening of the murder, she was out to dinner with Ms. Hamill's family. After leaving dinner, she and Ms. Hamill ran some errands and eventually went to a bowling alley. Ms. Baker explained that, while at the bowling alley, Mr. Hamill called Ms. Hamill and expressed his desire to rob the victim. Ms. Hamill and Ms. Baker then met Mr. Hamill at a 7-Eleven store and went to the victim's home. Ms. Baker stated that she and Ms. Hamill talked to the victim, and, at some point, Ms. Hamill announced that she was going outside to get her water. Upon re-entering the apartment, Ms. Baker asked Ms. Hamill where Mr. Hamill was, and Ms. Hamill responded that he was in the kitchen. Ms. Baker reported that she went to the bathroom where she heard Ms. Hamill walk from the kitchen to the living room and cough to signal for Mr. Hamill to enter the living room. Then Ms. Baker heard a gunshot.

Following the murder, Ms. Baker, Ms. Hamill, and Mr. Hamill left the home and reunited at a gas station nearby. There, they decided to return to the victim's residence and take his car. Ms. Baker stated that she stayed in Mr. Hamill's car, but believed that Ms. Hamill and Mr. Hamill took some items from the home in addition to the victim's car. The parties again reunited at a nearby gas station, and Ms. Baker and Ms. Hamill drove to Virginia while Mr. Hamill and an unknown female accompanying him drove the victim's car and Mr. Hamill's car away. Ms. Baker stated that "after [the murder] happened Courtney grabbed [the victim's cellphone]" and that, upon arriving in Virginia, Ms. Hamill attempted to destroy the cellphone by placing it under Ms. Baker's car tire. However, when that did not work, Ms. Hamill slammed the cellphone on the ground and "threw it off a bridge into water." Ms. Baker and Ms. Hamill then returned to the victim's home so that Ms. Hamill could take more items. Ms. Baker claimed that, later in the morning, Ms. Hamill became concerned about the body. Ms. Hamill and Mr. Hamill returned to the victim's home in an effort to remove the body but, upon their return, explained that they could not move the body because it was "too stiff." The next day, Ms. Hamill and Ms. Baker drove by the victim's home and saw that the lights were on. Realizing that someone had discovered the body, they called Mr. Hamill, and the three drove the victim's vehicle to Virginia and set it on fire. Ms. Baker stated that a gun was taken from the victim, and that a gun was left in the burning car, but that she was unsure as to whether the gun in the car was the victim's or Mr. Hamill's gun. During the confession, the interviewing officer questioned Ms. Baker as to whether they intended to kill the victim. Ms. Baker denied that their intent was murder and claimed that she believed the plan was only to rob the victim. Regarding questions of what was

---

[5]These statements did not match the covertly-recorded statement that Ms. Baker had given to the informant as both Ms. Baker and Ms. Hamill denied involvement in the murder. Additionally, apart from retrieving the victim's car in Virginia, the entirety of the investigation occurred in West Virginia.

stolen, Ms. Baker initially stated that she did not think anyone took anything at the time of the murder. However, she admitted that she received $200 on the night of the murder, which was taken from the victim's wallet, and that a gun and cellphone were taken at some point. Eventually, Ms. Baker entered a binding plea wherein she agreed to provide testimony against Mr. Hamill and Ms. Hamill and, in exchange, the State agreed to drop all the charges pending against her except for robbery, for which Ms. Baker would be sentenced to thirty-five years in prison.

In May of 2017, Mr. Hamill was indicted on one count of murder, one count of first-degree robbery, one count of burglary, one count of grand larceny, one count of conspiracy to commit robbery, and one count of being a prohibited person in possession of a firearm. Ms. Hamill was indicted on one count of murder, one count of first-degree robbery, two counts of burglary, and one count of conspiracy to commit robbery. Prior to trial, in March of 2018, Mr. Hamill moved the circuit court to sever the count of him being a prohibited person in possession of a firearm from the remaining charges. The circuit court denied the motion. Mr. Hamill renewed the motion later in March of 2018, but it was denied.

Petitioners' trial commenced on March 27, 2018.[6] The State elected to proceed under a felony murder theory and presented the testimony of numerous witnesses. Patrolman Rouse testified to arriving on the scene, finding the body, and observing that the home was ransacked. Patrolman Rouse also noted that the air conditioning in the apartment was not on. Captain Miller corroborated Patrolman Rouse's testimony of the location of the body and the state of the apartment. He added that kitchen cabinets and drawers were opened, boxes of shoes were strewn about, and clothes were thrown on the floor. Captain Miller testified that several items appeared to be missing from the apartment, including the victim's cellphone, wallet, firearm, and vehicle. Captain Miller also testified regarding his encounter with the informant and her assistance in recording the conversation with Ms. Baker, which resulted in Ms. Baker informing the informant that she and petitioners went to the victim's house with the intent to rob him.

Ms. Baker testified, providing information that was largely consistent with the confession she had given to the police following her arrest. However, Ms. Baker did point out some new information, including that Mr. Hamill, Ms. Hamill, Ms. Baker and an unknown female met at a Big Lots store to discuss the plans for the robbery. Ms. Baker testified that "[Mr. Hamill] just told us what to do when we got inside the house, and when we was going to come in." Additionally, Ms. Baker testified that when Ms. Hamill reentered the victim's living room after stating that she was going for a bottle of water, she informed Ms. Baker that Mr. Hamill was in the kitchen. Ms. Baker then entered the kitchen and saw Mr. Hamill, who motioned for her to be quiet. Ms. Baker stated that she went to the bathroom then because she "didn't want to be a part of it." While in the bathroom, Ms. Baker heard Mr. Hamill walk into the living room following

---

[6]During the trial, Mr. Hamill entered a stipulation regarding the count of being a prohibited person in possession of a firearm. Mr. Hamill specifically stipulated that he "has been convicted in this state, or another jurisdiction of a felony crime which would make it unlawful for him to simply possess a firearm. So he's a person prohibited from possessing."

4

Ms. Hamill's signal and tell the victim to get on the ground, followed by a gunshot. Ms. Baker testified that when she left the bathroom, she saw the victim "slouched on the couch, but he had his left leg on a computer chair." Ms. Baker noted that Mr. Hamill and Ms. Hamill took the victim's wallet, cellphone, and gun. The three reunited at a gas station and divided the money from the victim's wallet. From the gas station, Ms. Baker, Ms. Hamill, and Mr. Hamill returned to the victim's home. Ms. Hamill and Mr. Hamill took more items from the home and stole the victim's car. Ms. Baker testified that she and Ms. Hamill drove to Virginia to "get rid of his wallet and his phones." Ms. Baker stated that she ran over the victim's phone with her car. The pair then returned to the victim's home, and Ms. Hamill put several items in a suitcase, which she took with her. Ms. Baker testified that Mr. Hamill and Ms. Hamill returned to move the body, but could not. They were only able to move the victim to the floor. Ms. Baker also testified to destroying the victim's car.

On cross-examination, defense counsel exposed some of the inconsistencies in Ms. Baker's prior statement and her trial testimony. She admitted that she had failed to include some important details from her trial testimony in her statement. Mr. Hamill attempted to advance his theory that he murdered the victim in retaliation for his physical abuse of Ms. Hamill. Ms. Baker agreed that the victim had "treated [Ms. Hamill] like dirt." Ms. Hamill questioned Ms. Baker's ability to hear the footsteps from the kitchen to the living room. Ms. Hamill also challenged Ms. Baker's testimony that Ms. Hamill coughed as a signal to Mr. Hamill. While Ms. Baker admitted that Ms. Hamill developed a cough, she testified that it was not until several days after the murder.

The State also called Tammy Athey, who was Ms. Hamill's former cellmate while in jail. Ms. Athey testified that Ms. Hamill shared the details of the murder with her, including that she coughed to signal Mr. Hamill to enter the living room. Ms. Athey also testified that Ms. Hamill confessed that she had taken the victim's earrings off his ears, took his gun after the murder, and turned down the air conditioner. Ms. Athey stated that Mr. Hamill's motive for killing the victim was the physical abuse he perpetrated against Ms. Hamill. Ms. Athey admitted that she sought leniency for her current prison sentence in exchange for her testimony. Prior to the trial, Ms. Athey moved the circuit court to reconsider her sentence. Although her request was denied, Ms. Athey still chose to testify.

Calissa Carper, a firearm and toolmark examiner with the West Virginia State Police Forensic Laboratory, testified that she examined several weapons taken from Ms. Hamill's residence, along with the bullet that was found in the victim's hair. Ms. Carper opined that the bullet was fired from a Highpoint .45 caliber JHP, but could not conclusively state that the bullet was fired from the exact Highpoint handgun taken from Ms. Hamill's residence because the bullet was damaged.

Lastly, the State introduced several recorded phone calls Mr. Hamill made while in jail. In one of the calls, Mr. Hamill stated "he shouldn't have put hands on my sister . . . I killed him." Following the close of the State's case-in-chief, petitioners moved for a judgment of acquittal, arguing that the State failed to prove that a robbery, the basis for the felony murder theory, had occurred. Further, the only evidence of a plan to rob the victim came from Ms. Baker's

5

testimony, which was inconsistent and had been thoroughly impeached and discredited. However, the circuit court denied the motion, noting that it was a question for the jury.

Mr. Hamill presented no evidence in his case-in-chief. Ms. Hamill testified on her own behalf, giving a different series of events than those testified to by Ms. Baker. According to Ms. Hamill, Mr. Hamill called her while she was at the bowling alley to ask her if she would babysit his children the next morning. Ms. Hamill agreed and was going to go home to pack an overnight bag. During this time, the victim called Ms. Hamill and asked her to stop by his apartment to pick up money to deposit at his bank, which was located in the town where Mr. Hamill lived. Ms. Hamill agreed, and rode with Ms. Baker to Martinsburg. Mr. Hamill and an unknown female followed behind them. Ms. Hamill testified that the group met at a Big Lots store, where she explained to Mr. Hamill that she needed to briefly stop by the victim's home. Ms. Hamill stated that Ms. Baker stayed in her car and was not a part of the conversation, and denied hatching any plan to rob the victim. After Ms. Hamill and Ms. Baker arrived at the victim's home, Mr. Hamill called Ms. Hamill and asked to speak with the victim. About ten minutes later, Mr. Hamill arrived at the apartment, and he and the victim continued their conversation on the deck. Ms. Baker went to the bathroom during that time. While alone in the living room, Ms. Hamill picked up the victim's phone and began looking through it. Ms. Hamill testified that the victim discovered her looking through his phone, became angry, and began to hit her. At that time, Mr. Hamill walked into the room and told the victim to "leave her alone." Ms. Hamill testified that the victim punched Mr. Hamill and a physical altercation began. At some point, the victim reached for his gun and pointed it at Mr. Hamill. Mr. Hamill then drew his own weapon. The victim pulled the trigger of his gun, but it did not fire. Mr. Hamill then shot and killed the victim, and the three left the apartment to go to a nearby gas station. Ms. Hamill denied taking any personal property from the apartment or that they split money from the victim's wallet. Ms. Hamill also denied entering the home upon returning to the apartment so that Mr. Hamill could take the car, and driving to Virginia to dispose of the victim's phone or wallet. She further denied returning to the apartment to move the body. Ms. Hamill testified that she did assist in disposing of the vehicle, and stated that she slipped a gun in the door of the car.

In rebuttal, the State called Sergeant Adam Albaugh, a detective with the Martinsburg Police Department. Sgt. Albaugh testified that he examined the victim's gun and the gun cartridges, which were found in the burning car. Sgt. Albaugh stated that, contrary to Ms. Hamill's testimony, the gun showed no evidence of misfiring. Defense counsel objected to the introduction of the bullets found in the victim's gun into evidence, as the State failed to demonstrate the chain of custody. Counsel argued "there's a period of time that we don't know somebody had the gun on our side . . . [b]ut they could have put bullets in and taken bullets out." The circuit court overruled the objection, concluding that the "gun went from the apartment to the car, then to the burning area in . . . Virginia." The court noted, however, that defense counsel was free to argue the authenticity of the bullets to the jury. Following the close of evidence, petitioners renewed their motions for judgment of acquittal, which were again denied.

During deliberations, the jury asked the following questions in regard to the instructions provided for felony murder: "What does closely related in point of time and one continuous transaction mean? Can they leave and come back and have it be continued?" After consulting with counsel, the circuit court responded "[y]ou are to give the words their ordinary meaning

according to common usage and understanding." The circuit court further instructed that "the defendant or defendants may leave and come back, as long as it is closely related in point of time and one continuous transaction by your finding of fact in light of all the evidence before you."

Ultimately, the jury found Mr. Hamill and Ms. Hamill guilty of all counts charged. The circuit court sentenced Mr. Hamill to life in prison without mercy for the felony murder conviction, one to fifteen years for the burglary conviction, one to ten years for the grand larceny conviction, one to five years for the conspiracy to commit robbery conviction, and five years for the prohibited person in possession of a firearm conviction. The sentences were ordered to run consecutively. The circuit court sentenced Ms. Hamill to life in prison with mercy for the felony murder conviction, one to fifteen years for each of the burglary convictions, and one to five years for the conspiracy to commit robbery conviction. The sentences were ordered to run concurrently. Petitioners' sentences were memorialized in the circuit court's orders dated June 11, 2018. It is from these orders that petitioners appeal.

## **Discussion**

### I.

On appeal, petitioners first assign as error the circuit court's denial of their motions for judgment of acquittal. According to petitioners, there was insufficient evidence presented to support their convictions. Specifically, they claim that their felony murder and conspiracy to commit robbery convictions cannot be upheld because there was no credible evidence presented that they planned to rob the victim, which was the underlying felony relied upon for the felony murder theory. Ms. Baker's testimony was replete with material inconsistencies. For instance, Ms. Baker did not provide details of hatching the plan to rob the victim while in the Big Lots parking lot during her prior statement, but testified extensively about those plans at trial. Petitioners also claim that Ms. Baker initially informed police officers that nothing was taken at the time of the murders, but then testified that the victim's cellphone and wallet were taken. Further, in her prior statement, Ms. Baker did not recall ever seeing Mr. Hamill in the residence prior to going to the bathroom, while her trial testimony suggested that she saw him in the kitchen prior to entering the bathroom. Moreover, petitioners claim that Ms. Athey's testimony was likewise incredible. Ms. Athey provided several uncorroborated statements, including that Ms. Hamill removed earrings from the victim, disposed of the cellphone by throwing it from the car somewhere in Virginia, and turning down the air conditioning. This testimony was contrary to Patrolman Rouse's testimony that the air conditioning was off and Ms. Baker's testimony that they destroyed the cellphone by driving over it. Additionally, Ms. Athey had an ulterior motive in providing testimony, given that she nearly immediately sought leniency in her sentence. Petitioners claim that, given this incredible, inconsistent evidence, there is no way any rational trier of fact could have found the essential elements of the crimes were proven beyond a reasonable doubt. We find no merit in petitioners' arguments.

The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence. *See State v. LaRock*, 196 W. Va. 294, 304, 470 S.E.2d 613, 623 (1996). This Court has explained:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). Moreover,

[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 3, in part. Mindful of these imperatives, we consider whether the evidence presented at trial supports petitioners' convictions of conspiracy to commit robbery and felony murder.

The criteria for a conspiracy conviction are well-settled:

""In order for the State to prove a conspiracy under W.Va.Code, 61-10-31(1), it must show that the defendant agreed with others to commit an offense against the State and that some overt act was taken by a member of the conspiracy to effect the object of that conspiracy." Syl. Pt. 4, *State v. Less*, 170 W.Va. 259, 294 S.E.2d 62 (1981).' Syl. Pt. 3, *State v. Burd*, 187 W.Va. 415, 419 S.E.2d 676 (1991)." Syllabus point 5, *State v. Minigh*, 224 W.Va. 112, 680 S.E.2d 127 (2009).

Syl. Pt. 10, *State v. White*, 228 W. Va. 530, 722 S.E.2d 566 (2011). In this case, the underlying offence is robbery. "At common law, the definition of robbery was (1) the unlawful taking and carrying away, (2) of money or goods, (3) from the person of another or in his presence, (4) by force or putting him in fear, (5) with intent to steal the money or goods." Syl. Pt.1, *State v. Harless*, 168 W. Va. 707, 285 S.E.2d 461 (1981).

Regarding felony murder, this court has held as follows:

"'[T]he elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such

8

commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt.' *State v. Williams*, 172 W.Va. 295, [310,] 305 S.E.2d 251, 267 (1983)." Syllabus Point 5, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987).

Syl. Pt. 5, *Flack v. Ballard*, 239 W. Va. 566, 803 S.E.2d 536 (2017).

We find that sufficient evidence was presented such that a rational trier of fact could have found that petitioners were guilty of conspiracy to commit robbery and felony murder.[7]

---

[7]We note that several "inconsistencies" pointed out by petitioners are hardly inconsistencies. For example, petitioners claim that Ms. Baker never claimed to plan to rob the victim in her prior statement, but suddenly claimed to have planned the robbery in the parking lot of a Big Lots. While it is true that Ms. Baker never mentioned planning the robbery at Big Lots in her prior statement, she did admit that they planned to rob the victim. The following exchange occurred during Ms. Baker's statement:

| | |
|---|---|
| Captain Miller: | I mean, you all went there with the intent to rob him; right? Is that what the plan was? |
| Destiny Baker: | Courtney said that that is what the plan was, but I didn't think anything was going to happen. I didn't think Kevin was that type of person. I didn't think any of that was going to happen. |
| Captain Miller: | You just didn't think the murder was going to happen; right? |
| Destiny Baker: | Uh-uh. At all. |

Then later,

| | |
|---|---|
| Captain Miller: | So why was that the night picked to go and do the robbery? |
| . . . . | |
| Destiny Baker: | I don't know. We were just sitting at the bowling alley and Kevin called Courtney and told Courtney that he wanted to do it. |

As such, it is clear that Ms. Baker admitted from the beginning that they planned to rob the victim. Therefore, this alleged "inconsistency," along with the others like it, have no basis in fact and provide no support for petitioners' argument.

Petitioners' entire argument consists of attacking the credibility of the testimony of Ms. Baker and Ms. Athey, claiming that the inconsistencies in their testimony preclude a rational trier of fact from finding them guilty beyond a reasonable doubt. However, we note that petitioners had the opportunity to, and did, attack these inconsistencies before the jury in an attempt to raise issue with the witnesses' credibility. Indeed, by her own admission, Ms. Hamill "argued that [Ms.] Athey's testimony was not credible and had been impeached on cross-examination and urged the jury to give it no weight at all" and further noted that "[a]ll the . . . contradictions, additions and admissions were rigorously brought to light during the cross-examinations of both [Ms. Hamill's] counsel and counsel for co-defendant Kevin Hamill for the jury's consideration." As such, the jury was aware of any inconsistencies and assigned credibility accordingly. We decline to disturb the jury's credibility determination. *See Guthrie*, 194 W. Va. at 669 n.9, 461 S.E.2d at 175 n.9 ("An appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact."). Here, Ms. Baker testified that she, Mr. Hamill, and Ms. Hamill planned to rob the victim while in the parking lot of a Big Lots store. She and Ms. Hamill drove to the victim's home and talked with the victim for approximately forty-five minutes. Ms. Baker testified that Mr. Hamill entered the living room following Ms. Hamill's signal and shot the victim. Then Ms. Hamill and Mr. Hamill took the victim's wallet and cellphone, and later went back for his car and other personal items. Accordingly, despite any inconsistencies, the jury found that sufficient evidence existed to convict petitioners of felony murder and conspiracy to commit robbery. This jury determination is paramount, and we will not set it aside under the circumstances presented to us.

To the extent Ms. Hamill argues that there was insufficient evidence to support her burglary convictions, we likewise find no error.[8] Again, defense counsel had the opportunity to, and did, make known to the jury any inconsistencies in the testimony. This Court will not disturb any credibility determinations, as noted above. The evidence regarding Ms. Hamill's commission of burglary included Ms. Baker's testimony that Ms. Hamill went back to the home following the murder and removed items from the home. Further, following their attempts to destroy the phone, Ms. Baker and Ms. Hamill returned again to the victim's home, and Ms. Hamill removed more items, including clothing and shoes. The police officers' testimony regarding the "ransacked" state of the apartment also lends support to Ms. Baker's testimony regarding Ms. Hamill's multiple attempts to remove items from the apartment. Therefore, we find that sufficient evidence was presented to find that Ms. Hamill committed burglary on two separate occasions.

Lastly, Ms. Hamill sets forth an associated assignment of error in which she again essentially attacks the sufficiency of the evidence. Specifically, she alleges that the circuit court erred in answering the jury's questions regarding the continuous nature of the predicate robbery for felony murder without instructing the jury that the intent to rob must have existed before the

---

[8]West Virginia Code § 61-3-11(a) sets forth that a person is guilty of burglary if he or she "breaks and enters, or enters without breaking, a dwelling house or outbuilding adjoining a dwelling with the intent to commit a violation of the criminal laws of this state."

victim's death. According to Ms. Hamill, the jury's question of whether one continuous transaction could exist if she and Mr. Hamill left the victim's apartment and came back later evidenced their belief that the requisite intent to rob the victim had not been formed prior to the victim's death. However, Ms. Hamill's argument is completely speculative, and she cites to no portion of the record to support such a claim. Again, Ms. Baker testified that the trio planned the robbery in a Big Lots parking lot prior to going to the victim's home. Accordingly, the jury had sufficient evidence to find that the requisite intent to rob the victim was formed prior to the commission of the murder. Ms. Hamill is entitled to no relief in this regard.

II.

Ms. Hamill next argues that the circuit court erred in allowing Sgt. Albaugh to provide testimony regarding the bullets found in the victim's gun when they were not authenticated.[9] According to Ms. Hamill, there were approximately ten days in which the bullets could have been tampered with or replaced. As such, there is no way the circuit court should have been satisfied that the evidence was not tampered with, and it abused its discretion in allowing the jury to hear testimony regarding the bullets, which discredited her "otherwise credible testimony" that the victim was the first to produce a gun, which misfired. We find no error.

Rule 901(a) of the West Virginia Rules of Evidence sets forth, in part, that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "A trial court's ruling on authenticity of evidence under Rule 901(a) of the West Virginia Rules of Evidence will not be disturbed on appeal unless there has been an abuse of discretion." Syl. Pt. 12, *State v. Boyd*, 238 W. Va. 420, 796 S.E.2d 207 (2017).

---

[9]While Ms. Hamill states that the chain of custody was never established, her true argument is that the bullets were not properly authenticated.

> "The 'chain of custody' rule is simply a variation of this principle [of authentication], *United States v. Howard–Arias*, 679 F.2d 363, 366 (4th Cir.), cert. denied, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982), and requires that a prosecutor seeking to introduce evidence must establish a chain of custody *from the time the items were taken to show that they are in substantially the same condition as when they were seized*."

*State v. Knuckles*, 196 W. Va. 416, 423, 473 S.E.2d 131, 138 (1996) (emphasis added and citation omitted). Petitioner argues that the bullets could have been tampered with prior to the police officer's seizure of the gun. She does not claim that officers tampered with the bullets after the gun was retrieved from the car, nor does she contest the chain of custody or authentication of the gun. As such, her argument will be treated as challenging the authentication of the bullets, rather than their chain of custody following their seizure.

Here, the testimony established that the murder occurred on Tuesday, January 10, 2017, and the victim's gun was taken at that time. Two days later, on Thursday, January 12, 2017, officers discovered the body, and Ms. Baker, Ms. Hamill, and Mr. Hamill attempted to dispose of the victim's vehicle and gun by setting them on fire in the early morning hours of the following day. Early Friday morning, police officers were notified of the burning car and arranged for it to be taken back to West Virginia and stored until it could be inventoried and searched. On January 20, 2017, Ms. Baker provided her recorded confession wherein she reported that the gun had been left in the burning car. Sgt. Albaugh testified that officers found the gun in the door of the car, and that the plastic of the car door was completely melted around the gun at the time it was retrieved. Sgt. Albaugh then removed the magazine and unchambered round from the gun, packaged them, and placed them into evidence. Based on this evidence, the circuit court noted "I'm not hearing anything so fantastic that the jury couldn't conclude, or speculat[e] that a gun went from the apartment to the car, then to the burning area in Boyce, Virginia . . . ." We agree with the circuit court's conclusion. The evidence here is sufficient to establish that the bullets are what the State claimed them to be—the bullets that were in the victim's gun on the night of the murder. Accordingly, we find no abuse of discretion in the circuit court's decision to permit the testimony. Ms. Hamill is entitled to no relief in this regard.

III.

Lastly, Mr. Hamill argues that the circuit court erred in denying his motion to sever the count of being a prohibited person in possession of a firearm from the remaining counts in the indictment. According to Mr. Hamill, refusing to sever this count from the others was extremely prejudicial. In order for the State to convict Mr. Hamill of the count of being a prohibited person in possession of a firearm, it would have been necessary to introduce evidence of his prior felony conviction(s) to the jury, which included a conviction for robbery in Virginia. Because the circuit court denied the motion to sever, Mr. Hamill claims that he was forced to enter a stipulation to prevent the evidence of his prior robbery, a felony for which he was also charged in the underlying proceedings, from being presented to the jury. Mr. Hamill contends that this evidence would have encouraged the jury to convict him on the other counts based upon his "propensity" to commit these types of crimes. Further, this evidence would have been inadmissible in another trial had the count been severed.[10] Moreover, Mr. Hamill claims that he chose not to testify

---

[10]In support of his argument, Mr. Hamill claims that the State was permitted to "circumvent its substantial burden" under *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994). In *McGinnis*, we outlined the procedure for determining admissibility of extrinsic evidence under West Virginia Rule of Evidence 404(b). Mr. Hamill relies upon our holding in Syllabus Point 2 of *State v. Frank* that "[a] defendant is not entitled to relief from prejudicial joinder pursuant to Rule 14 of the West Virginia Rules of Criminal Procedure when evidence of each of the crimes charged would be admissible in a separate trial for the other" to support his argument of the inverse—that severance of his counts was mandated given the inadmissibility of the evidence of his count of prohibited person in possession of a firearm in a trial of the other counts charged in the indictment. 236 W. Va. 761, 765, 783 S.E.2d 881, 885 (2016) (citation omitted). We decline to reach such a conclusion here given the findings set forth more fully

(continued . . .)

"partially based" upon the circuit court's denial of his motion to sever because, had he testified, he "very likely could have opened the door to his prior robbery conviction." Based on the foregoing, Mr. Hamill concludes that the circuit court erred in denying his motion to sever. Upon our review, we find that Mr. Hamill is entitled to no relief in this regard.

"[W]here joinder or consolidation of offenses is proper under the West Virginia Rules of Criminal Procedure, the trial court may order separate trials pursuant to Rule 14(a) on the ground that such joinder or consolidation is prejudicial." *State v. Rash*, 226 W. Va. 35, 44, 697 S.E.2d 71, 80 (2010) (citing syl. pt. 3, in part, *State v. Hatfield*, 181 W. Va. 106, 380 S.E.2d 670 (1988)). Rule 14(a) of the West Virginia Rules of Criminal Procedure provides, in relevant part:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of the counts or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the state to deliver to the court for inspection in camera any statements or confessions made by the defendant or other relevant information which the state intends to introduce in evidence at the trial.

We have noted that

> it is incumbent upon a trial judge to consider in some depth a motion to grant a severance if: (a) a joint trial will raise so many issues that a jury may conclude that the defendant is a "bad man" and must have done something, and consequently will convict him as a "bad man" rather than on a particular charge; (b) if one offense may be used to convict him of another, though proof of that guilt would have been inadmissible at a separate trial; and (c) the defendant may wish to testify in his own defense on one charge but not on another.

*State v. Ludwick*, 197 W. Va. 70, 73, 475 S.E.2d 70, 73 (1996). However,

> [c]ourts have acknowledged the risk that multiple charges in a single trial may lead a jury to infer a criminal disposition and cumulate evidence against the accused, but rarely find the risk sufficient to require severance. *The mere claim that the jury will infer a criminal disposition and thus make it more difficult for the accused to make his case is not enough . . . .*

*State v. Frank S.*, 236 W. Va. 761, 766, 783 S.E.2d 881, 886 (2016) (citation omitted). In fact, this Court has previously rejected a defendant's claim that severance was required because the

---

above. Further, we note that "[w]hile we have condoned the use of a *McGinnis* hearing to determine whether to sever charges under West Virginia Rule of Criminal Procedure 14(a), we have never extended our holding in *McGinnis* to require it." *Id.* at 767, 783 S.E.2d at 887 (citations omitted). Therefore, we find that petitioner is entitled to no relief in this regard.

jury might cumulate the evidence and assume the defendant to be a bad person, noting: "Generally, this type of alleged prejudice is rarely sufficient to grant relief against joinder [under West Virginia Rule of Criminal Procedure 14(a)]." *Id.* (citing *State v. Milburn*, 204 W. Va. 203, 209, 511 S.E.2d 828, 834 (1998)). Lastly, we note that the decision to grant a motion for severance pursuant to Rule 14(a) is a matter within the sound discretion of the trial court. *Hatfield*, 181 W. Va. at 107, 380 S.E.2d at 671, syl. pt. 3. Such a ruling will not be reversed unless it appears that the circuit court's exercise of its discretion was clearly wrong. *Id.*

We are unable to conclude that the circuit court abused its discretion in denying petitioner's motion to sever. The record is clear that the circuit court "fretted over this a good bit." In considering the matter, the circuit court ultimately denied the motion, finding that the facts of the crimes were inextricably intertwined:

> I mean, it is integral to the transaction that gives rise to the charge as a whole. The facts are entirely inextricably intertwined for the substance of: Did he have a gun or didn't he?
>
>     . . . .
>
> Obviously the paramount concern is giving each party a fair trial. And I am weighing—in my view—inextricable nature of the offense of felon in possession of a firearm from the other offense[s]. And just, to me, I just think . . . it is all part of the same transaction occurrence . . . .
>
>     . . . .
>
> [F]rankly, I think there might be pragmatic reasons why a second trial would be difficult.

The circuit court also relied upon the State's response, in which it argued that "the facts surrounding Mr. Hamill's use of a firearm in the robbery and shooting of the victim would be necessary to prove the allegations set forth in [the count of being a prohibited person in possession of a firearm]." Mr. Hamill's arguments that the jury would have found him guilty of the other counts in the indictment because he was a "bad man" fall short given our holding that "[t]he mere claim that the jury will infer a criminal disposition and thus make it more difficult for the accused to make his case is not enough." *Frank S.*, 236 W. Va. at 766, 783 S.E.2d at 886. Mr. Hamill's argument that he was prejudiced due to having to stipulate to a prior felony in order to exclude evidence of the same is likewise without merit given this holding. To the extent that Mr. Hamill argues that he was forced to refrain from testifying on his own behalf, he has not shown what he would have testified to if not for his need to refrain from testifying about the count of being a prohibited person in possession of a firearm. "There is no need for severance until a defendant makes a convincing showing both that he or she has important testimony to give regarding one count and a strong need to refrain from testifying on the other count." *State v. Milburn*, 204 W. Va. 203, 209, 511 S.E.2d 828, 834 (1998) (citation omitted). Ultimately, the events and evidence related to all counts of the indictment were intertwined, and there was no good method of disentanglement. Upon a review of the record, the parties' arguments, and

applicable law, we find that the circuit court did not abuse its discretion in denying the motion to sever.

## Conclusion

For the foregoing reasons, we affirm the circuit court's June 11, 2018, sentencing orders.

Affirmed.

**ISSUED**:  January 17, 2020

**CONCURRED IN BY**:

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

15