IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

**FILED**

**June 8, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0169

KEVIN GOODMAN, JR.,
Petitioner Below, Petitioner

v.

SHELBY SEARLS, SUPERINTENDENT, HUTTONSVILLE CORRECTIONAL
CENTER,
Respondent Below, Respondent.

Appeal from the Circuit Court of Fayette County
The Honorable Paul M. Blake, Jr.
Case No. 17-C-342

AFFIRMED

Petition for Rehearing Granted:  March 3, 2022
Submitted:  May 17, 2022
Filed:  June 8, 2022

Lonnie C. Simmons, Esq.
J. Timothy DiPiero, Esq.
Luca D. DiPiero, Esq.
DIPIERO SIMMONS MCGINLEY & BASTRESS, PLLC
Charleston, West Virginia
Attorneys for Petitioner

Patrick Morrisey, Esq.
Attorney General
Lindsey S. See, Esq.
Solicitor General
Mary Beth Niday, Esq.
Gordon L. Mowen, II, Esq.
Charleston, West Virginia
Attorneys for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.     "In reviewing challenges to findings and conclusions of a circuit court in a habeas corpus action, we apply a three-prong standard of review.  We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review."  Syllabus Point 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

2.     "In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  Syllabus Point 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

3.     "'Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.' Syl. Pt. 21, *State v. Thomas*,

i

157 W. Va. 640, 203 S.E.2d 445 (1974)." Syllabus Point 3, *State v. Frye*, 221 W. Va. 154, 650 S.E.2d 574 (2006).

4. "In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Syllabus Point 6, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

5. "In order to obtain a new trial on a claim that the prosecutor presented false testimony at trial, a defendant must demonstrate that (1) the prosecutor presented false testimony, (2) the prosecutor knew or should have known the testimony was false, and (3) the false testimony had a material effect on the jury verdict." Syllabus Point 2, *State ex rel. Franklin v. McBride*, 226 W. Va. 375, 701 S.E.2d 97 (2009).

WALKER, Justice:

A jury convicted Kevin Goodman, Jr. of first-degree robbery, conspiracy, and entry of a dwelling after he and several accomplices entered the home of an elderly couple and held them and their grandchildren at gunpoint while members of the group stole a safe and other items. We affirmed the conviction in 2017, and now Mr. Goodman appeals the circuit court's denial of his petition for writ of habeas corpus.[1]

Mr. Goodman argues that his trial counsel provided ineffective assistance by failing to introduce certain evidence and not requesting specific jury instructions. He also claims that the prosecutor violated his constitutional rights by knowingly presenting false testimony. But, in deeming his lawyer's decision-making deficient, Mr. Goodman fails to recognize that many reasonable lawyers would have strategically made the same decisions under the circumstances. Mr. Goodman likewise mischaracterizes a witness's contradiction of prior statements as presentation of false evidence by the State. So, we find Mr. Goodman failed to meet his burden of proof and affirm the circuit court's denial of his petition.

---

[1] Shelby Searls replaced Tom Harlan as superintendent of the Huttonsville Correctional Center after the petitioner filed this appeal. So, we substituted the parties according to Rule 41(c) of the West Virginia Rules of Appellate Procedure.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Goodman's brother, Kentrell Goodman (Kentrell), previously lived in Oak Hill, West Virginia, and during his time there, spent significant time in the home of Linda and Edward Knight because he was friends with their grandson, Andrew Gunn. At some point shortly before January 9, 2015, Kentrell and his girlfriend, Linsey Hess, moved from Oak Hill to the home of Benita Wicker (Aunt Benita) in Little Mountain, South Carolina. Aunt Benita is the paternal aunt of Kentrell and Mr. Goodman, and Rashod Wicker is Aunt Benita's son and first cousin of Kentrell and Mr. Goodman. By the time Kentrell moved in with Aunt Benita, Mr. Goodman split his time living there or at his girlfriend, Courtney Curry's, nearby apartment. Mr. Wicker, Tamika Bookman, and Shakayla Wicker (Shakayla) also lived with Aunt Benita.

Antwyn Gibbs and Radee Hill lived in separate homes close to Aunt Benita's house and spent some time there with Kentrell, Mr. Goodman, and Mr. Wicker. A few days before January 9, 2015, Kentrell told Mr. Goodman about a significant stash of money Mr. Gunn kept in a safe in his bedroom inside the Knights' home, and Mr. Goodman told Kentrell something to the effect of "[l]et's go get money." The Goodman brothers then recruited the assistance of Mr. Wicker, Mr. Hill, and Mr. Gibbs, and at some time between midnight and 1:00 a.m. on January 9, 2015, the group departed South Carolina with Mr. Wicker driving Ms. Hess's car towards Oak Hill, West Virginia.

2

The group arrived in Oak Hill at around 7:30 or 8:00 that morning, and Mr. Wicker parked the car near a wooded area 50-60 feet from the Knights' house. Mr. Wicker has cerebral palsy which limits his mobility, so he stayed in the car while the others retrieved several guns from the trunk and descended upon the Knights' home. Ms. Knight left a door to her home ajar that morning after letting her dogs out, and as she sat on the couch in the living room preparing her granddaughter's hair for school, she saw a long-gun ease through the door and several men covering their faces and yelling follow closely behind. Ms. Knight refused one of the intruder's demand that she get on her knees and instead remained seated on the couch where her eighteen-year-old, disabled grandson buried his head in her lap and cried while her five-year-old granddaughter cowered behind her.

Two of the intruders proceeded to ransack Mr. Gunn's room while at least one other held the victims at gunpoint. Those in Mr. Gunn's bedroom located the safe and threw it, two pairs of Jordan athletic shoes, and a crossbow out the window. The group then gathered the objects and fled back to the getaway car, which Mr. Wicker drove back to South Carolina. When they arrived later that day, they went to Mr. Gibbs's home to blast open the safe with a shotgun and divided the contents of approximately $10,000 amongst themselves. Members of the group then transported the damaged safe to Aunt Benita's house and disposed of it behind a shed in her yard. Ms. Hess heard Mr. Goodman and Kentrell discussing the robbery days before it happened and then saw Mr. Goodman, Kentrell, and Mr. Wicker with the safe at Aunt Benita's house.

3

Immediately after the robbery, officers from the Oak Hill police department responded to the scene to investigate. Shortly into the investigation, Mr. Goodman's mother told investigators that she suspected Mr. Goodman's involvement and directed the officers to his whereabouts in South Carolina. And on January 14, 2015, officers from the Oak Hill Police Department traveled to Newberry, South Carolina and, with the help of local law enforcement, obtained and executed a search warrant on Aunt Benita's home. The police found, among other things, the opened safe behind the shed and Mr. Goodman's wallet in a bedroom with a shotgun, a rifle, and two handguns. Kentrell and Mr. Wicker were present when the police executed the warrant, and the police arrested them. Each gave statements admitting to the robbery and implicating Mr. Goodman, Mr. Gibbs, and Mr. Hill. The same day, police executed a search warrant at Mr. Gibbs's home and found fragments of the safe and spent shotgun shells in the backyard. Phone records showed that on the morning of the robbery, Mr. Gibbs's phone pinged on cell towers in Max Meadow, Virginia, Flat Top, West Virginia, and Oak Hill, West Virginia.

A grand jury indicted Mr. Goodman, Kentrell, Mr. Gibbs, Mr. Wicker, and Mr. Hill jointly on charges of first-degree robbery, entry of a dwelling, grand larceny, and conspiracy. Before trial, Kentrell and Mr. Wicker pled guilty to first degree robbery, and the State dropped the other charges in exchange. Kentrell and Mr. Wicker testified against Mr. Goodman, Mr. Gibbs, and Mr. Hill at their joint trial, and after the State presented its case, Mr. Goodman offered his girlfriend, Courtney Curry, as an alibi witness and testified in his own defense. Ms. Curry claimed she picked Mr. Goodman up from Aunt Benita's

4

at around 8:30 a.m. on January 9, 2015. But, Ms. Curry sent Ms. Hess a text message at around 1:00 a.m. that day asking if she knew Mr. Goodman's whereabouts, and Ms. Hess responded that he traveled to West Virginia with Kentrell. Mr. Goodman claimed he passed out drunk and slept the whole night on Aunt Benita's couch before Ms. Curry picked him up and that Ms. Hess either mistakenly said he was in West Virginia or lied. He also claimed that Aunt Benita, Shakayla, and Ms. Bookman were all home when he woke up on the 9th, but the prosecutor pointed out on cross-examination that Mr. Goodman presented none of them as alibi witnesses.

The jury found Mr. Goodman, Mr. Gibbs, and Mr. Hill guilty of first-degree robbery, entry of a dwelling, and conspiracy. The trial court sentenced Mr. Goodman to 52-65 years in prison. In 2017, this Court affirmed the convictions and Mr. Goodman's sentence.[2]

Mr. Goodman filed a petition for writ of habeas corpus in the Circuit Court of Fayette County on February 11, 2019. Mr. Goodman alleged, among other things, ineffective assistance of counsel and that the State violated his constitutional rights by presenting false testimony. Mr. Goodman claimed that trial counsel provided ineffective assistance by failing to introduce allegedly exculpatory tollbooth images and failing to request certain jury instructions. Mr. Goodman's trial counsel testified at an omnibus

---

[2] *State v. Gibbs*, 238 W. Va. 646, 797 S.E.2d 623 (2017).

hearing about the circumstances surrounding the ineffective assistance claims. He stated that he reviewed the tollbooth videos before trial and "believe[ed] they had no value" and that he told Mr. Goodman

> hey, they had some tollbooth video, but it really only shows the car going through. And—when I looked at that, you know, the windows were kind of glazed you couldn't see into the vehicle. So to me and how I believe I explained it to [Mr. Goodman], although I don't recall the exact words, was the only thing the videos do is confirm the times in which the vehicle did go through the tollbooth which did nothing but corroborate the co-defendant story.

Mr. Goodman's habeas counsel showed trial counsel a still frame photo from one of the tollbooth videos and trial counsel claimed that he had never seen the still frame image and that he would have introduced it to the jury had he seen it before trial.

Trial counsel also testified that, at the time of Mr. Goodman's trial, he knew about the availability of jury instructions limiting the jury's consideration of accomplices' guilty pleas only to assess the accomplices' credibility and advising the jury to consider uncorroborated accomplice testimony with caution. He claimed he did not request the instructions but that the "[trial court's] general charge ha[d] some warnings concerning that in it . . . ." And trial counsel responded, "no," when Mr. Goodman's habeas counsel asked "[w]as there any conceivable strategic reason for not asking for any of these cautionary instructions to the [c]ourt?"

6

The circuit court denied the habeas petition after finding that trial counsel provided effective assistance and that the State did not present false testimony. Mr. Goodman now appeals the order.

## II. STANDARD OF REVIEW

We review habeas corpus proceedings under a multipronged standard:

> In reviewing challenges to findings and conclusions of a circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.[3]

## III. ANALYSIS

On appeal, Mr. Goodman raises two assignments of error. First, he claims that the circuit court should have found ineffective assistance of counsel based on trial counsel's failure to introduce the allegedly exculpatory photo and video evidence from the West Virginia tollbooths and to request jury instructions related to the jury's consideration of co-defendants' testimony about their guilty pleas and other testimony. Second, Mr. Goodman claims that the trial court erred by finding his rights "were not violated when the State presented false testimony from a witness, who lied at trial and identified [Mr. Goodman] as one of the perpetrators, told the jury that it could believe the perjured

---

[3] Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

7

testimony, and the State failed to take appropriate action to correct the admission of this perjured testimony."

## A.    *Mr. Goodman Failed to Prove Ineffective Assistance of Counsel*

To begin our analysis of Mr. Goodman's claims of ineffective assistance of counsel, we recognize the overarching standard that "[o]ur law is clear in recognizing that the Sixth Amendment of the federal [C]onstitution and Article III, § 14 of the state [C]onstitution guarantee not only the assistance of counsel in a criminal proceeding but that a defendant has 'the right to effective assistance of counsel.'"[4] And it is well established that a two-part test applies:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.[5]

When reviewing whether counsel's performance was deficient under the first prong, this Court gives strong deference to the actions of defense counsel, and "[w]hen assessing whether counsel's performance was deficient, we 'must indulge a strong

---

[4]  *Ballard v. Ferguson*, 232 W. Va. 196, 200, 751 S.E.2d 716, 720 (2013) (citing *Cole v. White*, 180 W. Va. 393, 395, 376 S.E.2d 599, 601 (1988)).

[5]  Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

8

presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]'"[6] In other words, "[j]udicial scrutiny of counsel's performance must be highly deferential[,]"[7] and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[8] Finally, "'[w]here a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.' Syl. Pt. 21, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974)."[9] And, as to the second prong, "[t]o demonstrate prejudice, a defendant must prove there is a 'reasonable probability' that, absent the errors, the jury would have reached a different result."[10] We may resolve some ineffective assistance claims on only one prong of the test because "[i]n deciding ineffective of assistance claims [sic], a court need not address both prongs of the conjunctive standard . .

---

[6] *Miller*, 194 W. Va. at 15, 459 S.E.2d at 126 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

[7] *Strickland*, 466 U.S. at 689.

[8] *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91 (1955)).

[9] Syl. Pt. 3, *State v. Frye*, 221 W. Va. 154, 650 S.E.2d 574 (2006).

[10] *Miller*, 194 W. Va. at 15, 459 S.E.2d at 126 (quoting *Strickland*, 466 U.S. at 694).

. but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test."[11]

Initially, we note that Mr. Goodman emphasizes that his trial constituted trial counsel's first jury trial. But, trial counsel's experience does not affect our objective analysis of his conduct, because "[t]he test of ineffectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most good lawyers would have done . . . . [W]e are interested in whether the adversarial process at the time, in fact, worked adequately."[12] Mindful of these standards, we turn to Mr. Goodman's specific allegations of ineffective assistance of counsel.

### 1.     *The Tollbooth Images*

Mr. Goodman first claims that trial counsel's representation fell outside of the broad range of professionally competent assistance because of his failure to "introduce into evidence the exculpatory video showing that [Mr. Goodman] was not in the vehicle used in the crime . . ." and "[trial counsel] evidently performed only a cursory review of the footage as he later acknowledged that he would have introduced the video had he investigated in further detail."

---

[11] Syl. Pt. 5, in part, *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 465 S.E.2d 416 (1995).

[12] *Miller*, 194 W. Va. at 16, 459 S.E.2d at 127.

As to trial counsel's decision not to introduce the tollbooth footage, Mr. Goodman focuses on one still frame photo taken from one of the toll booth videos that he believes most clearly depicts that "as [Ms. Hess's] car passes under the roof of the toll booth, the glare on the slanted back windshield disappears, showing there is no person seated in this car directly behind the driver." But the circuit court "thoroughly reviewed the turnpike toll booth videos" and found "[Mr. Goodman] places far more weight and exculpatory value on the video tape than it actually warrants." The circuit court explained that it "meticulously reviewed each and every segment of the collected video tapes . . . [, and] at best, the videos are inconclusive as to the occupancy of the subject vehicle and are of no significant exculpatory value."

Our analysis of the subject videos and still frame in the appendix record yields no reason to quarrel with the circuit court's finding that the videos and photo are indiscernible, do not reveal the backseat occupancy as Mr. Goodman argues, and offer little exculpatory value. The photo shows only a silver Acura sedan matching the description of Ms. Hess's car driving through the toll booth at 9:17 a.m. on the morning of the robbery and a collage of reflections and glare in the darkly tinted back windshield with a possible silhouette of a person seated in the back right-hand side of the car, and all other portions of the videos reveal even less. That said, there is nothing in the videos to support a finding that the circuit court clearly erred in its findings.

11

Since the videos had little exculpatory value, trial counsel made a reasonable, strategic decision not to introduce them into evidence. Just as trial counsel explained to Mr. Goodman before the trial, the videos placed the vehicle in West Virginia, contained time stamps matching the robbery timeline, and supported the State's theory that the group traveled back to South Carolina after executing the robbery. So, by not introducing the toll booth videos which may have been more harmful than beneficial, trial counsel's decision can be attributed to sound trial strategy, and other reasonable lawyers presented with the same circumstances might have made the same decision.

Regarding Mr. Goodman's criticism that trial counsel failed to adequately investigate the tollbooth videos, we note that trial counsel reviewed them, reasonably found they contained little exculpatory value, discussed them with Mr. Goodman before trial, and strategically decided not to admit them. We will not engage in the scrupulous hindsight of trial counsel's actions necessary to deem his investigation deficient.[13]

For these reasons, Mr. Goodman fails to prove ineffective assistance of counsel for trial counsel's investigation of and decision not the introduce the toll booth videos.

---

[13] *See* Syl. Pt. 6, *id.*, 194 W. Va. 3, 459 S.E.2d 114.

## 2.    *The Caudill and Humphreys Jury Instructions*

Mr. Goodman next argues that trial counsel offered ineffective assistance by not requesting a *Caudill* jury instruction or a *Humphreys* jury instruction.  A circuit court gives a *Caudill* instruction to inform the jury that it may consider an accomplice's testimony about their guilty plea only to assess the credibility of the accomplice's testimony and not to prove the guilt of the defendant.[14]  In *State v. Flack*, we clarified that the circuit court is only required to give the instruction upon motion by the defendant.[15] Likewise, a circuit court should give a *Humphreys* instruction when requested by the defense.[16]  A *Humphreys* instruction advises the jury that "uncorroborated testimony of an accomplice . . . must be received with caution . . . ."[17]

While Mr. Goodman claims trial counsel provided ineffective assistance by not requesting either the *Caudill or Humphreys* instruction, Mr. Goodman conflates his argument for both instructions by arguing that "[b]oth of these cautionary instructions, which the trial court would have been required to give under the facts of this case, were

---

[14] *See* Syl. Pt. 3, *State v. Caudill*, 170 W. Va. 74, 289 S.E.2d 748 (1982).

[15] *See* Syl. Pt. 1, *State v. Flack*, 232 W. Va. 708, 753 S.E.2d 761 (2013).

[16] *See* Syl. Pt. 1, *State v. Humphreys*, 128 W. Va. 370, 36 S.E.2d 469 (1945).

[17] *Id.*

critical because the main evidence against [Mr. Goodman] was the testimony of two alleged accomplices who had pleaded guilty to the crimes [Mr. Goodman] was facing[,]" and "[w]ithout these two helpful and critical cautionary instructions, the jury was provided no guidance on how it should evaluate the testimony of Mr. Wicker and Kentrell." Despite Mr. Goodman blending his argument, we separately address, in turn, trial counsel's choices not to request a *Caudill* or *Humphreys* instruction.

Mr. Goodman claims that "[u]nder the objective test, a reasonable attorney would have sought [a *Caudill*] instruction[] under these facts and there is a reasonable probability that this deficiency, combined with the failure to present the exculpatory video, would have resulted in a different outcome." Mr. Goodman cites Syllabus Point 1 of *Flack*[18] to support his argument. But, in its analysis of the deficiency prong of *Strickland*, the circuit court found "it rather telling that two other veteran attorneys involved in the joint trial also did not request the instruction[]" and that "as a tactical matter, trial counsel might not want" a *Caudill* instruction given. But, the circuit court "assum[ed] deficiency without deciding the issue" and resolved the claim on the prejudice prong. The circuit court seemed hesitant to decide the deficiency prong because trial counsel "appear[ed] to confess error under the deficiency prong of *Strickland/Miller* . . . ." But, as noted by many courts applying *Strickland*, a defendant does not satisfy the deficiency prong with their trial

---

[18] *See* Syl. Pt. 1, *Flack*, 232 W. Va. 708, 753 S.E.2d 761.

14

lawyer's subjective belief that they may have erred in hindsight.[19]  And, as stated by this Court:

> [i]n reviewing counsel's performance, courts *must apply an objective standard* and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.[20]

So, "[e]ven though [Mr. Goodman's] own counsel . . . testified at the evidentiary hearing that he believed he made a mistake . . . the Court's inquiry is an *objective* one."[21]  And, trial counsel's testimony that he knew of no strategic reason for failing to request the *Caudill* instruction does not satisfy the deficiency prong, because a petitioner satisfies the prong by showing that "no reasonably qualified defense attorney would have so acted in the defense of an accused[,]"[22] and trial counsel's subjective knowledge of possible strategies has no bearing on what other lawyers may have done

---

[19]  *See*, *e.g. United States v. Bordon*, No. 98-0427-CR, 2007 WL 4180877, at *10 (S.D. Fla. Nov. 21, 2007).

[20]  Syl. Pt. 6, *Miller*, 194 W. Va. 3, 459 S.E.2d 114 (emphasis added).

[21]  *Bordon*, 2007 WL 4180877, at *10 (citing *Chandler v. United States*, 218 F.3d 1305, 1315 n. 16 (11th Cir. 2000) and *Waters v. Thomas*, 46 F.3d 1506, 1522 (11th Cir. 1995)).

[22]  Syl. Pt. 21, in part, *Thomas*, 157 W. Va. 640, 203 S.E.2d 445.

15

under the circumstances. We choose to resolve this claim under the deficiency prong, because, under the objective standard, *Flack* proves the reasonableness of trial counsel's decision not to request a *Caudill* instruction. [23]

The facts surrounding the botched theft in *Flack* possess eerie similarities to the robbery for which the jury convicted Mr. Goodman. In January 2011, the *Flack* defendant traveled with three accomplices from Pulaski, Virginia to a home in Bluefield, West Virginia intending to burglarize the defendant's uncle's home.[24] Upon arrival at the home, the group discovered the defendant's seventeen-year-old second cousin, Matthew Flack, and two other boys alone in the home.[25] The group then forced their way into the home and one of the defendant's accomplices, Jasman Montgomery, killed Matthew by shooting him in the face.[26] Montgomery later pled guilty to first degree murder and testified against the *Flack* defendant.[27] Montgomery testified about his guilty plea and the *Flack* defendant later appealed his conviction arguing, among other things, that the circuit

---

[23] In *Flack v. Ballard*, we found the deficiency prong satisfied "for purposes of [that] proceeding" after the trial lawyer at issue in that case admitted to being unaware of the existence of a *Caudill* instruction. 239 W. Va. 566, 579, 803 S.E.2d 536, 549 (2017). But, as indicated, we limited the holding on the deficiency prong to that case and instead resolved the claim on the prejudice prong.

[24] *Flack*, 232 W. Va. at 710, 753 S.E.2d at 763.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 711, 753 S.E.2d at 764.

court committed plain error by not giving the jury a *Caudill* instruction on its own initiative.[28] This Court held that circuit courts have no duty to give a *Caudill* instruction unless the defense requests the instruction.[29] We adopted the State's reasoning that "defense counsel, faced with the difficult task of dealing with damaging testimony of an accomplice, may not want to have a *Caudill* instruction because such an instruction could emphasize the damaging testimony[, and] [i]n such cases the trial court could be interfering with a defendant's right to develop his own trial strategy."[30] The Court also reasoned that "[d]efense counsel may have ample reason to get beyond an accomplice's damaging testimony as quickly as possible[, and] [w]hether the trial court should instruct the jury how the accomplice's damaging testimony could, or could not, be considered is a matter left to the discretion of defense counsel."[31]

In this instance, we would directly contradict our reasoning in *Flack* if we found every reasonable lawyer would request a *Caudill* instruction under the circumstances. Instead, we follow the sound reasoning to avoid interfering with defense lawyers' ability to develop their trial strategy. We reiterate that defense lawyers often face difficult decisions about whether to request a *Caudill* instruction, and we leave the

---

[28] *Id.* at 713, 753 S.E.2d at 766.

[29] *See*, Syl. Pt. 1., *id.*

[30] *Id.* at 713, 753 S.E.2d at 766.

[31] *Id.* at 714, 753 S.E.2d at 767.

17

decisions in their discretion. At Mr. Goodman's trial, a reasonable lawyer in trial counsel's position would have to make the decision between drawing more attention to damaging accomplice testimony or getting the possible benefit of a *Caudill* instruction and may have decided to move past the damaging testimony as quickly as possible.

Since trial counsel made a calculated decision by a reasonable lawyer standard, he acted within the broad range of acceptable professional conduct. Mr. Goodman's claim surely does not rebut the presumption that one might objectively consider the challenged action sound trial strategy, and he fails to prove that no reasonable lawyer would fail to request instruction under the circumstances.

Turning to Mr. Goodman's other jury instruction argument, he claims that trial counsel performed deficiently by failing to request a *Humphreys* instruction informing the jury that uncorroborated witness testimony must be received with caution. But, the circuit court found "the circumstances did not warrant giving the jury an accomplice testimony cautionary instruction[]" since other evidence corroborated the accomplice testimony. So, the circuit court also found "[Mr. Goodman's] claim against his trial counsel is . . . without merit[,]" because Mr. Goodman cannot "establish that his counsel was constitutionally ineffective under either prong of *Strickland/Miller* for failing to request an instruction that was not warranted."

18

We agree with the circuit court that the evidence corroborated Kentrell and Mr. Wicker's testimony and that trial counsel, therefore, acted reasonably by choosing not to request an unwarranted instruction. Kentrell and Mr. Wicker both testified that Mr. Goodman traveled with them, Mr. Gibbs, and Mr. Hill to West Virginia and participated in the robbery. Each corroborated the other's testimony. Ms. Hess also corroborated their testimonies by testifying that she heard Mr. Goodman planning the robbery with Kentrell and then saw Mr. Goodman and Kentrell with the safe after the robbery. The jury also considered, among other things, the following corroborating evidence: 1) the text message Ms. Hess sent Ms. Curry stating that Mr. Goodman traveled to West Virginia with Kentrell, 2) Mr. Goodman's wallet in Aunt Benita's home in a room with several guns and the opened safe in the backyard, 3) fragments of the safe in Mr. Gibb's backyard with phone records that showed Mr. Gibbs's travel to West Virginia on the morning of the robbery, 4) the investigator's testimony that the Oak Hill Police Department pinned Mr. Goodman as a suspect after his mother reported her suspicion that Mr. Goodman participated in the robbery, and 5) Mr. Goodman's own discredited testimony that he passed out drunk and slept on Aunt Benita's couch during the robbery.

But, what's more, trial counsel and the lawyers for Mr. Goodman's jointly tried co-defendants requested, and the circuit court gave, a jury instruction telling the jury it must individually consider the credibility of witnesses. So, we are confident the adversarial process worked adequately. Indeed, a "decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are

19

shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'"[32]  In no way did trial counsel's decision not to request the arguably inapplicable and duplicative jury instruction permeate the entire trial with unfairness.  For these reasons, Mr. Goodman fails to rebut the presumption that trial counsel made what might have been a sound strategic decision not to request a *Humphreys* instruction.

### B.     Mr. Gunn's Inconsistent Trial Testimony.

In his second assignment of error, Mr. Goodman challenges the circuit court's finding that the prosecutor did not offer false testimony in violation of Mr. Goodman's constitutional rights.  We explained in Syllabus Point 2 of *State ex rel. Franklin v. McBride*[33] what a petitioner must prove when claiming a prosecutor presented false testimony:

> In order to obtain a new trial on a claim that the prosecutor presented false testimony at trial, a defendant must demonstrate that (1) the prosecutor presented false testimony, (2) the prosecutor knew or should have known the testimony was false, and (3) the false testimony had a material effect on the jury verdict.[34]

Mr. Goodman claims the prosecutor presented false testimony through Mr. Gunn who identified Mr. Goodman as one of the robbers.  Before identifying Mr. Goodman

---

[32]  *Meadows v. Mutter*, 243 W. Va. 211, 222, 842 S.E.2d 764, 775 (2020) (quoting *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995)).

[33]  226 W. Va. 375, 701 S.E.2d 97 (2009).

[34]  *Id.*

20

at trial, Mr. Gunn initially told investigators that he did not know the intruders and that one looked like "Robert Lee" and it may have been a guy named Drake that played on his basketball team. He then identified Mr. Goodman's father, Kevin Goodman, Sr., in a photo line-up conducted by police a few days after the robbery. But, at trial, the prosecution called Mr. Gunn as a witness, and he testified that he recognized Mr. Goodman as one of the robbers. Trial counsel then cross-examined him about the inconsistent statement and used all of Mr. Gunn's prior identifications to impeach him:

> Q. So three days after the crime and the day of the crime, you were not under arrest, you were not facing charges for anything, you were the victim of a crime, and the police came to your aid, and you completely lied to the police? Is that your testimony today?
>
> A. I guess. I don't even want to be—want to be here.
>                 . . .
> Q. Are you being honest with the Court today?
>
> A. Yes.

And, the prosecutor's redirect of Mr. Gunn likewise questioned the inconsistency:

> Q. . . . Explain to me in your own words why it is today that you feel certain that Kevin Goodman, Jr., was in your house.
>
> A. Well, I kind of knew it was him, but I didn't want to—I didn't want to believe it. You know what I mean? So I finally—I said (unintelligible).

Mr. Gunn's inconsistent statements required the jury to make a credibility determination, [35] but "[i]nconsistencies between a witness's trial testimony and their previous statements, or between the testimonies of multiple witnesses, do not necessarily demonstrate falsity."[36] Mr. Gunn's exchanges with trial counsel and the prosecutor show that Mr. Gunn may have been uncooperative during the investigation but later had a change of heart at trial. We agree with the circuit court's finding that "it is unclear whether Mr. Gunn was being untruthful during the investigation, during his trial testimony, or both" and that Mr. Goodman "did not present any evidence to support this claim at the habeas hearing" because he offered only the inconsistent statements. So, Mr. Goodman correctly recognizes that "[a]t the trial, Mr. Gunn surprised everyone by testifying that he identified [Mr. Goodman] as being involved. The only thing [Mr. Goodman's] counsel could do at that point in the trial was to confront Mr. Gunn with his previous inconsistent statements."

Because these inconsistent statements are insufficient to prove that the prosecutor presented false testimony under *McBride*, Mr. Goodman's second assignment of error lacks merit.

---

[35] *State v. Guthrie*, 194 W. Va. 657, 669, 461 S.E.2d 163, 175 (1995) ("Credibility determinations are for a jury and not an appellate court.").

[36] *Ballard*, 239 W. Va. at 581, 803 S.E.2d at 551.

## IV. CONCLUSION

For the reasons set out above, we affirm the circuit court's February 13, 2020, order denying Mr. Goodman's petition for writ of habeas corpus.

Affirmed.